UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| WEDIL DAVID, an Individual,<br><br>Plaintiff,<br><br>v.<br><br>THE WEINSTEIN COMPANY LLC;<br>THE WEINSTEIN COMPANY HOLDINGS<br>LLC; HARVEY WEINSTEIN, ROBERT<br>WEINSTEIN, LANCE MAEROV, RICHARD<br>KOENIGSBERG, TARAK BEN AMMAR,<br>DIRK ZIFF, TIM SARNOFF, PAUL TUDOR<br>JONES, JEFF SACKMAN, and JAMES<br>DOLAN,<br><br>Defendants. | Index No. 1:18-cv-05414 (RA)<br><br>**THIRD AMENDED COMPLAINT<br>AND JURY DEMAND** |

Plaintiff Wedil David, by and through her attorneys, Wigdor LLP and the Law Office of

Kevin Mintzer, P.C., for her Third Amended Complaint alleges as follows:

## <u>NATURE OF THE CASE</u>

1.      As he had so often before, Harvey Weinstein ("HW"), co-Chairman and co-CEO

of The Weinstein Company LLC and The Weinstein Company Holding LLC (collectively, the

"Companies"), used the promise of a role in one of the Companies' productions to lure an

aspiring actress to a hotel.  There, HW sexually assaulted her, including by forcibly throwing her

onto a bed, wrenching down her jeans, and jamming his penis inside her vagina.  That actress is

Wedil David, Plaintiff in this action.

2.      HW's brother and long-time business partner, Robert Weinstein ("RW"), had for

decades covered for HW's sexual misconduct and created an environment where Ms. David and

scores of other female employees and actresses were harmed by a sexual predator, yet RW did nothing to warn these women about HW's propensity to engage in sexual misconduct, or prevent HW from using the Companies' resources to lure these women to him.

3.     At the time of HW's brutal attack on Ms. David, HW's propensity to sexually assault women such as Plaintiff was also well known to the Companies' Board of Directors ("Board"), which included RW as co-Chairman.

4.     Indeed, despite repeated notice of HW's predations, the Board members not only failed to strip him of his power, but because of personal and financial interests, they crafted a contract that effectively anticipated HW's rapaciousness and priced it into his employment.

5.     The 2015 contract required HW to indemnify the Companies for "any claim, action or incident that was described in [HW's] personnel file."

6.     Moreover, the 2015 contract required HW to reimburse the Companies for "a payment to satisfy a claim that [HW] treated someone improperly in violation of the Companies' Code of Conduct" – *i.e.* a payment related to HW's sexual misconduct.

7.     In addition to reimbursing the Companies, HW also had to pay $250,000 for the first instance of what it euphemistically termed "misconduct," $500,000 for a second instance, $750,000 for a third instance, and $1,000,000 for each instance thereafter.

8.     The 2015 contract also required both a majority vote of the Board and approval of RW as co-Chairman before the Companies could terminate HW for felony indictment involving fraud, dishonesty or moral turpitude or for a willful violation of the Code of Conduct that has caused serious harm to the Companies.

9.     As long as HW paid the money, the "misconduct" was, from the perspective of Board members, "cured."

10.     After the Board approved the 2015 contract essentially affording HW corporate impunity for sexual misconduct, he raped Plaintiff.

## PARTIES

11.     Plaintiff WEDIL DAVID ("Plaintiff" or "Ms. David"), at all relevant times resided in the County of Los Angeles, State of California.

12.     Plaintiff is informed and believes, and based thereon alleges that Defendant THE WEINSTEIN COMPANY LLC is now and at all relevant times was a Delaware limited liability company headquartered in New York, New York, and with offices in Los Angeles, California.

13.     Plaintiff is informed and believes, and based thereon alleges that Defendant THE WEINSTEIN COMPANY HOLDINGS, LLC is now and at all relevant times was a Delaware limited liability company headquartered in New York, New York, and with offices in Los Angeles, California.

14.     DEFENDANT WEINSTEIN CO. HOLDINGS and DEFENDANT WEINSTEIN CO. hereinafter shall be collectively referred to as the "Companies."

15.     Plaintiff is informed and believes, and based thereon alleges that Defendant HARVEY WEINSTEIN ("HW") is an individual who at all relevant times herein, was a resident of New York, New York.  HW is the co-founder, and was the co-Chairman and co-CEO of the Weinstein Co. from its inception in or about 2005 until his termination in October 2017.

16.     Plaintiff is informed and believes, and based thereon alleges that Defendant ROBERT WEINSTEIN  ("RW") is an individual who at all relevant times herein was a director, co-Chairman and co-CEO of the Companies and primarily worked out of the Companies' Los Angeles office.  RW also co-founded the Companies with HW.

17.     Plaintiff is informed and believes, and based thereon alleges that Defendant LANCE MAEROV is an individual who at all relevant times herein was a resident of Bedford, New York and was a director of the Companies.

18.     Plaintiff is informed and believes, and based thereon alleges that Defendant RICHARD KOENIGSBERG is an individual who at all relevant times herein was a resident of Franklin Lakes, New Jersey and was a director of the Companies.

19.     Plaintiff is informed and believes, and based thereon alleges that Defendant TARAK BEN AMMAR is an individual who at all relevant times herein resided in Paris, France and was a director of the Companies.

20.     Plaintiff is informed and believes, and based thereon alleges that Defendant DIRK ZIFF is an individual who at all relevant times herein was a resident of New York, New York and was a director of the Companies.

21.     Plaintiff is informed and believes, and based thereon alleges that Defendant TIM SARNOFF is an individual who at all relevant times herein was a resident of the County of Los Angeles and was a director of the Companies.  On May 21, 2018, Defendant Sarnoff moved to transfer this action from the Central District of California to this Court.

22.     Plaintiff is informed and believes, and based thereon alleges that Defendant PAUL TUDOR JONES is an individual who at all relevant times herein was a resident of New York, New York and was a director of the Companies.

23.     Plaintiff is informed and believes, and based thereon alleges that Defendant JEFF SACKMAN is an individual who at all relevant times herein was a resident of Toronto, Canada and was a director of the Companies.

4

24.     Plaintiff is informed and believes, and based thereon alleges that Defendant JAMES DOLAN is an individual who at all relevant times herein was a resident of Miller Place, New York and was a director of the Companies.

25.     Defendants ROBERT WEINSTEIN, LANCE MAEROV, RICHARD KOENIGSBERG, TARAK BEN AMMAR, DIRK ZIFF, TIM SARNOFF, PAUL TUDOR JONES, JEFF SACKMAN, and JAMES DOLAN hereinafter will be referred to collectively as the "Director Defendants."

26.     On information and belief, the Director Defendants attended the Companies' board meetings in New York and otherwise participated in directing the Companies' supervision of HW in New York and/or California.

27.     On information and belief, by virtue of their positions as Board members of the Companies, each of the Director Defendants attended board meetings and participated in other events on behalf of the Companies giving rise to the violation while in New York County, and availed themselves of the laws of New York and are subject to jurisdiction in New York.

28.     Plaintiff is informed and believes, and based thereon alleges that at all relevant times, each Defendant was the principal, agent, partner, joint venturer, officer, director, controlling shareholder, subsidiary, affiliate, parent corporation, successor in interest, and/or predecessor in interest of some or all of the other Defendants, and was engaged with some or all of the other Defendants in a joint enterprise for profit, and bore such other relationships to some or all of the other Defendants so as to be liable for their conduct with respect to the matters alleged below.

29.     Plaintiff is informed and believes, and based thereon alleges that at all relevant times, the Companies are joint ventures in that each business combined its property, skill or

knowledge with intent to carry out a single business undertaking, each has an ownership interest in the business, they have joint control over the business even if they agreed to delegate control, and they have agreed to share the profits and losses of the business and that together, at all relevant times herein, the Companies regularly conducted business in New York.

## JURISDICTION AND VENUE

30.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1334, 1452, and 1367(a).

31.     Venue is lodged in this Court pursuant to 28 U.S.C. § 1412.

## JURY TRIAL DEMANDED

32.     Plaintiff demands trial of all issues by jury.

## FACTUAL ALLEGATIONS

### I.     HW Sexually Assaults and Rapes Ms. David

33.     Defendant HW was the co-Chairman and co-CEO of the Companies from 2005 to October 2017.  HW wielded enormous power and influence in the film industry.

34.     In late 2011, Ms. David met HW at a party that the Companies were hosting at the Chateau Marmont in Los Angeles.  Ms. David was an actress and informed HW of the same when she was introduced to him at the event.

35.     Upon learning that Ms. David was an actress, HW offered to assist her with her acting career and requested her telephone number.  She obliged.

36.     Over the next few years, HW invited Ms. David to attend awards show parties that the Companies hosted and maintained regular communication with Plaintiff every few months thereafter.

37.     Ms. David is informed and believes that HW used a phone paid for by the Companies to communicate with her and to discuss potential job opportunities.

38.     In late 2015, Ms. David met HW at the Montage Hotel in Beverly Hills, California to discuss a prospective acting job on a television show called "Marco Polo."

39.     HW and RW served as executive producers on Marco Polo. On information and belief, HW and RW, as well as the Companies, held a financial interest in the performance of Marco Polo and maintained control over how the program would be made and distributed.

40.     HW also told Ms. David that he wanted her to do some voiceover work for him because her voice was "soft and sexy," and he also said he had another movie role that he would cast her in.

41.     At some point, he said he wanted to masturbate in front of her.  Ms. David told HW that she did not want him to masturbate in front of her.

42.     HW told her that he would not touch her, but "only" wanted her to watch him. Despite her telling HW "no," HW proceeded to grip her wrist with one hand while using the other to masturbate in front of her until completion.

43.     In early spring of 2016, HW contacted Ms. David again to meet with him at the Montage Hotel in Beverly Hills to celebrate her upcoming role in Marco Polo, giving her the impression that she had been chosen for the part.

44.     Ms. David agreed to meet with HW since she had already had several phone calls and emails with the Companies' employees about a role on Marco Polo, including speaking with a producer for Marco Polo.

45.     When Ms. David arrived at HW's hotel room, there were scripts all over the hotel room and HW said he was exhausted from meetings all day. On information and belief, those meetings were conducted in HW's hotel room.

46.     At some point, HW excused himself and returned wearing a bathrobe.  Before Ms. David could leave, HW grabbed her and pulled her into the bedroom.

47.     Ms. David told HW that she did not want to do anything sexual with him.  He forcefully threw Ms. David onto the bed.  He pulled down her jeans and started to orally copulate her.  Ms. David pushed HW's head off of her and told him, "Stop!"  HW then used his massive weight and strength to force himself on her, pushing his penis inside of her vagina without a condom.  After he withdrew, he gripped her with one hand while using his other hand to masturbate.  Ms. David finally broke free from his grasp and immediately left the bedroom and suite.

48.     HW contacted Ms. David thereafter and acted as if nothing had happened.  He told her he was coming to Los Angeles.  Ms. David swore at him and hung up the phone.

49.     Ms. David never received a job offer for the Marco Polo project even though she had been previously told that she would be a perfect addition to the show.  Nor did she receive any offers for other projects that HW had discussed with her.

50.     Based on information and belief, HW used the Companies' credit cards to pay for his hotel rooms at the Montage and used the Companies' travel agent to book his travel and hotel stays.

## II.    RW Conceals HW's Prior Sexual Misconduct

51.      In 1979, RW and HW founded Miramax.

52.      In 1993, RW and HW sold Miramax to Disney, but both continued to work for Miramax.

53.      At Miramax, RW knew that HW engaged in a pattern of sexual misconduct and he helped HW cover it up.

54.      RW's assistant at Miramax in the early 1990s, Kathy DeClesis, told the *New York Times* that HW's harassment of women "wasn't a secret to the inner circle,"[1] which included RW.

55.      Ms. DeClesis also supervised a young woman who left the company abruptly after an encounter with HW, and that young woman later received a settlement.[2]

56.      RW personally knew the circumstances that caused this young woman's abrupt departure because Ms. DeClesis handed RW a letter from the young woman's lawyer, telling RW that, "Your brother is a pig."[3]

57.      In 1998, RW personally paid £250,000 to settle claims asserting that HW had sexually assaulted and attempted to rape a female employee.[4]

---

[1]      Jodi Kantor & Megan Twohey, *Harvey Weinstein Paid Off Sexual Harassment Accusers for Decades*, THE NEW YORK TIMES (Oct. 5, 2017), https://www.nytimes.com/2017/10/05/us/harvey-weinstein-harassment-allegations.html (last accessed May 17, 2019).

[2]      Id.

[3]      Halle Kiefer, *Bob Weinstein's Former Assistant Says She Told Hom About His Brother Harvey's Sexual Harassment Over 25 Years Ago*, VULTURE (Oct. 20, 2017), https://www.vulture.com/2017/10/bob-weinstein-ex-assistant-he-knew-about-harvey-decades-ago.html (last accessed May 17, 2019).

[4]      Holly Watt, *Harvey Weinstein's Aide Tells of "Morally Lacking" Non-Disclosure Deal*, THE GUARDIAN (Mar. 28, 2018, 11:37 AM), https://www.theguardian.com/film/2018/mar/28/harvey-weinstein-assistant-zelda-perkins-i-was-trapped-in-a-vortex-of-fear  (last accessed May 17, 2019).

58.     The settlement agreement explicitly lists RW as one of the parties being released, and only RW or HW could consent to the release of confidential information covered by the settlement agreement.[5]

59.     A *New York Times* article summarized RW's and others executives' active concealment of HW's sexual misconduct:

> Fellow executives helped mask Mr. Weinstein's behavior going back to 1990. That year, a 23-year-old assistant said he sexually assaulted her when she ran an errand at his home. Bob Weinstein worked on the confidential settlement, according to two people familiar with the agreement — the first of at least three he would be involved in over the years.[6]

60.     RW had both personal and financial motives to help conceal HW's sexual misconduct.

61.     RW and HW were brothers and long-time business partners, and therefore RW had an interest in protecting HW and the businesses that they created.

62.     In 2003, RW wrote about his relationship with HW in an article for *Vanity Fair*. RW explained:

> Despite our different focuses, not a day goes by that we don't speak to each other at least five times, to offer suggestions, ask advice, deal with business matters, **and generally watch each other's back**. We remain partners in every way.[7]

63.     RW also engaged in his own abusive behavior such that he could not point the finger at HW for engaging in his sexual misconduct.

---

[5]     Excerpts of the agreements were submitted to the Women and Equalities Committee of the U.K. Parliament and can be found at https://www.parliament.uk/documents/commonscommittees/women-and-equalities/Correspondence/Zelda-Perkins-SHW0058.pdf (last accessed May 17, 2019).

[6]     Megan Twohey et al., Weinstein's Complicity Machine, THE NEW YORK TIMES (Dec. 5, 2017), https://www.nytimes.com/interactive/2017/12/05/us/harvey-weinstein-complicity.html (last accessed May 17, 2019).

[7]     Bob Weinstein, All Thanks To Max, VANITY FAIR (Apr. 2003), https://www.vanityfair.com/news/2003/04/ max-weinstein-200304 (last accessed May 17, 2019) (emphasis added).

64.      Executives who worked directly with RW in the 1990s describe RW as "genuinely abusive to people in my company," [8] and claimed that "Bob was the one [of the brothers] that was actually scarier — he was much less predictable."[9]

65.      In an October 14, 2017 interview with the Hollywood Reporter, RW admits that he previously had anger issues, and explained, "Without getting into details, I've done enough work, and I've faced my own self."[10]

66.      RW also reportedly engaged in his own inappropriate sexual behavior,[11] and was romantically involved with at least one employee while at Miramax.

67.      Although RW knew about HW's prior sexual misconduct and helped cover it up, RW made public statements praising HW's "good" behavior.

68.      RW is quoted in a September 30, 2004 *New York* magazine article, stating:

> I'm proud of my brother. He has changed a lot of the rough edges, and people have noticed it. People in the press, maybe they want the old Harvey. They're going, "**What's with the kinder, gentler Harvey**?" But Harvey actually took a little self-examination and said, 'I could probably get the same things done and be less, uh, strict.'"[12]

69.      Thus, despite his knowledge of HW's sexual misconduct, RW maintained the public perception that HW was a "kind" and "gentle" person.

---

[8]      Alexandra Berzon & Ben Fritz, *The Other Brother: Bob Weinstein Was an Abusive Boss*, THE WALL STREET JOURNAL (Oct. 17, 2017, 8:17 PM), https://www.wsj.com/articles/the-other-brother-bob-weinstein-was-an-abusive-boss-1508285834 (last accessed May 17, 2019) (emphasis added).

[9]      Ryan Faughnder, *It was Bob and Harvey Weinstein against the world.  Then they turned on each other*, LOS ANGELES TIMES (Oct. 18, 2017, 4:50 PM) https://www.latimes.com/business/hollywood/la-fi-ct-bob-weinstein-20171018-story.html (last accessed May 17, 2019).

[10]      Matthew Belloni & Gregg Kilday, *Bob Weinstein Gets Emotional on "Depraved" Harvey, Saving the Company and His "Waking Nightmare" (Exclusive)*, THE HOLLYWOOD REPORTER (Oct. 14, 2017, 7:14 AM), https://www.hollywoodreporter.com/news/bob-weinstein-gets-emotional-depraved-harvey-saving-company-his-waking-nightmare-1048905 (last accessed May 17, 2019).

[11]      Faughnder, supra note 9.

[12]      Seth Mnookin, *How Harvey Weinstein Survived His Midlife Crisis (For Now)*, NEW YORK MAGAZINE (Sept. 30, 2004), http://nymag.com/nymetro/news/people/features/9985/ (last accessed May 17, 2019) (emphasis added).

**III.**   **RW and HW Leave Miramax to Start the Companies**

70.   Despite RW's knowledge and active concealment of HW's sexual misconduct, RW decided to leave Miramax with HW to start the Companies in 2005.

71.   RW also agreed to provide HW with employment terms that effectively prevented him from being terminated from the Companies short of a felony conviction of a crime of moral turpitude – which RW knew would not occur so long as he or HW paid off those who accused HW of sexual assault and rape.

72.   While RW and HW shared control of the Companies' operations, **RW effectively gave HW free reign to run his portion of the business despite RW's knowledge of HW's prior sexual misconduct**, and knowledge that HW continued to engage in similar sexualized and abusive conduct.

73.   In a 2017 interview with the *Hollywood Reporter* ("Hollywood Reporter Interview"),[13] RW admitted that he "actually was quite aware that Harvey was philandering with every woman he could meet" and it "was one after another and that [he] was aware of."

74.   Based on RW's long history working with HW and his active efforts to cover up HW's sexual misconduct, RW knew that HW posed a risk to the female employees and actresses he encountered in connection with the Companies' business.

75.   RW explained in the Hollywood Reporter Interview,

> It's hard to describe how I feel that he took out the emptiness inside of him in so many **sick and depraved ways**. It's a sickness but not a sickness that is excusable. It's a sickness that's inexcusable. **And I, as a brother, understood and was aware as a family member that my brother needed help and that something was wrong**.[14]

---

[13]      Belloni & Kilday, <u>supra</u> note 10.

[14]      Belloni & Kilday, <u>supra</u> note 10.

76.     RW also explained in the Hollywood Reporter Interview, "Harvey was a bully, Harvey was arrogant, he treated people like shit all the time.  That I knew.  And I had to clean up for so many of his employee messes."

77.     Despite RW's knowledge of HW's prior and continuing sexual and abusive conduct, RW did nothing to warn or otherwise protect the female employees and actresses from HW's propensity to engage in sexual misconduct.

78.     To the contrary, RW permitted HW to misuse the Companies' funds and resources to engage in his sexual misconduct.

79.     In particular, HW had three groups of female employees at the Companies that he utilized to assist him in engaging in sexual activity: (1) female employees whose primary job was to accompany HW to events and help facilitate HW's sexual conquests; (2) female assistants who were required to take various steps to further HW's regular sexual activity; and (3) female executives who were required to meet with prospective sexual conquests to facilitate HW's sexual activity.[15]

80.     HW also used the Companies' paid hotel rooms, job opportunities, invitations or tickets to events to lure female employees and actresses to him, and provided them flowers, gifts robes, lingerie, and other gifts purchased on the Companies' corporate credit card.

81.     RW also knew that HW was doing nothing to address his sexualized and abusive behavior.

82.     In the Hollywood Reporter Interview, RW explained, "I asked him to get help for many years.  And that's the truth.  He avoided getting the help.  We begged him."[16]

---

[15]     Verified Petition, People v. The Weinstein Company et al., Index No. 450293/2018 (Feb. 2, 2018), at ¶¶ 44-45, 49.

[16]     Belloni & Kilday, supra note 10.

83.     HW's behavior got so bad that RW himself personally stopped interacting with HW – although again he did nothing to stop HW or warn other female employees and actresses about the consequences of being around HW.

84.     In the Hollywood Reporter Interview, RW explained, "Do you know how disgusted I am?  I divorced my brother five years ago.  Literally.  And those that know me personally in this company understood how I could not take being around him on any level."[17]

85.     RW also moved to Los Angeles to run the Companies' office there so he could further distance himself from HW and not be forced to take action to stop his sexual misconduct.

86.     Although RW distanced and protected *himself* from HW, he still did nothing to warn or protect those who continued to be exposed to HW's sexual misconduct, even as RW continued to learn about HW's repeated acts of sexual misconduct.

87.     A petition filed by the New York Attorney General Office explains that,

> RW also received by email in late 2014 and 2015, and was otherwise informed of, claims of repeated and persistent sexual harassment and misconduct, but he took no measures to further investigate the claims of misconduct, to terminate HW's employment, to restrict or prohibit HW from supervising women or having or seeking sexual contact with TWC employees or women seeking to do business with TWC, or from HW having private meetings with employees or women seeking opportunities in hotel rooms or TWC office space, or any other concrete measure that may have avoided HW's ongoing misconduct.[18]

88.     Instead of taking any action, RW in 2015 continued to back HW in connection with his continued employment at the Companies without any restrictions on his authority, with the knowledge that such unconstrained authority provided HW with the opportunity and temptation to engage in sexual misconduct

---

[17]     Id.

[18]     See supra note 15, at ¶ 99.

89.     RW's and HW's re-signing of employment contracts in 2015 also sent a message of their "commitment to the company they launched a decade ago"[19] and gave the false perception that HW was not the sexual predator that RW knew him to be.

90.     In addition to RW's familiar relationship with HW, RW had a financial self-interest not to take any action with respect to HW since the success of the Companies was tied to HW, who described as the "the face of the company."

91.     At the time of the Companies' bankruptcy, RW owned a 21% share in the Companies, and bankruptcy filings show that he personally loaned $11,187,363 to the Companies.

92.     In early 2014, HW also began to steer the Companies into a successful new television production venture, and there was a hope among the Board (including RW) that HW could help turn around the Companies' financial problems.[20]

93.     RW and the rest of the Board members also feared that the termination of HW's employment could cause financial harm to the Companies and may even constitute a material event that could trigger a default on the Companies' debts.[21]

94.     Thus, RW had the financial incentive not to warn the Board about HW's sexual misconduct, or reveal his own prior acts to conceal HW's sexual misconduct.

95.     In the Hollywood Reporter Interview, *after* the public exposure of HW's sexual misconduct, RW belatedly admits that he should have done something sooner.

---

[19]     Ali Jaafar, *Harvey And Bob Weinstein Re-Up At The Weinstein Co. For Three More Years*, DEADLINE (Nov. 7, 2015, 7:12 AM), https://deadline.com/2015/11/harvey-and-bob-weinstein-re-up-at-the-weinstein-co-for-three-more-years-1201609169/

[20]     Shawn Tully, *How a Handful of Billionaires Kept Their Friend Harvey Weinstein in Power*, FORTUNE (Nov. 19, 2017), http://fortune.com/2017/11/19/weinstein-scandal-board-battles/ (last accessed May 17, 2019).

[21]     Id.

96.     RW explained in the Hollywood Reporter interview, "Nobody is perfect. I'm not perfect.  If I made mistakes, I apologize to everyone for not standing up stronger and sooner. . . . And I'll apologize for my own lack of strength at times."

97.     Although RW stated in the Hollywood Reporter Interview that he regrets and holds himself accountable for not taking action sooner, RW has consistently fought against being legally held accountable for his actions that permitted HW to engage in sexual misconduct for decades.

## IV.     The Director Defendants Knew About HW's Sexual Misconduct, But Their Personal and Financial Interests Resulted in Them Taking No Action to Stop HW

98.     For decades, HW engaged in a pattern and practice of sexually harassing female employees and applicants as well as actresses seeking professional opportunities from him.

99.     Specifically, over the course of more than twenty years, HW sexually harassed numerous women, including at least three women who reported having been raped by HW and four who reported other kinds of assault.

100.     In addition, at least 16 former and current Company employees reported witnessing or having knowledge of unwanted sexual advances and touching by HW at events associated with HW's films and in the workplace.  HW's sexual misconduct was widely known within both Miramax and the Weinstein Co.

101.     Prior to the incidents involving Plaintiff, the Companies' executives, officers, directors, managing agents, and employees had actual knowledge of HW's repeated acts of sexual misconduct with women.

102.     For example, a Company executive wrote to a Weinstein Co. employee who had reported being harassed by HW and described HW's sexual misconduct as a "serial problem" with which the Weinstein Co. had been struggling for years.

103.    Another female executive at the Weinstein Co. described how HW's assistants and others served as a "honeypot" in that they would initially join a meeting along with a woman that HW was sexually interested in, but then HW would dismiss them "so that he could be alone with the woman."

104.    In particular, the Companies were aware of HW's pattern of using his power and the promise of procuring jobs to coerce and force actresses to engage in sexual acts with him.

105.    An executive who worked at the Weinstein Co. reported that for many years HW had engaged in "ongoing predatory behavior toward women—whether they consented or not."[22]

106.    Each Director Defendant had the power to supervise HW, to limit his contact with female employees or actresses seeking professional opportunities in the entertainment industry, and to take concrete steps to stop him.

107.    The Director Defendants also had the power to refuse to renew HW's employment contract in 2015, but failed to act because of HW's power and influence on the Companies' Board and due to concerns of financial and/or reputational harm to the Companies and the Director Defendants.

108.    The Companies and Directors Defendants were all aware that HW used hotel rooms paid for by the Companies to conduct the Companies' business.

109.    In fact, HW had throughout his career used hotel rooms to conduct business.

110.    Zelda Perkins, HW's assistant in the late 1990s, explained in an interview with BBC News:

> Everybody went to his hotel. **This is where he did business**. It wasn't in his bedroom, it was in his suite.  You had top agents, top

---

[22]     Ronan Farrow, *From Aggressive Overtures to Sexual Assault: Harvey Weinstein'sAccusers Tell Their Stories*, THE NEW YORKER (Oct. 10, 2017), https://www.newyorker.com/ news/news-desk/from-aggressive-overtures-to-sexual-assault-harvey-weinsteins-accusers-tell-their-stories (last accessed May 17, 2019).

movie stars - male and female - coming in hourly for meetings. **This was his place of business**.[23]

111.    The Companies, through its management, and the Director Defendants were aware of multiple claims of sexual misconduct against HW, which were settled prior to the initiation of litigation.

112.    RW paid for prior settlements of claims made by women against his brother, HW, after those claims were made known to him as a member of management of Miramax, his prior company with HW.

113.    Based upon information and belief, although key members of the Companies' management were fully aware of HW's sexual harassment of others, they did not take reasonable steps to investigate or stop it.

114.    According to the Companies' policies, complaints of harassment were to be submitted to the Human Resources Director, who had the authority to decide whether a complaint had sufficient merit to warrant investigation.

115.    The Human Resources Director's regular practice was to escalate any complaints deemed to be significant to a particular executive, to whom the Human Resources Director directly reported.

116.    Based upon information and belief, on more than one occasion prior to Plaintiff's sexual assault in 2016, upon forwarding a complaint or information about a complaint of sexual misconduct to said executive, the Human Resources Director was not involved in any investigation or resolution process.   Such matters were handled by the Companies' senior management.

---

[23]     *Harvey Weinstein: Ex-assistant Speaks Out on "How Hollywood kept Harvey's secret*," BBC News, Published December 19, 2017, available at https://www.youtube.com/watch?v=q91eZF9_ggI (last accessed May 17, 2019) (emphasis added).

117.    By early 2015, certain corporate executives at the Companies who had received and handled numerous claims of misconduct from the Companies' employees became so concerned about HW's misconduct towards women, as well as his expenditure of company resources on improper items, that they decided to notify a Board member about the misconduct.

118.    In response to this information, some Board members sought access to HW's personnel file so that the Board's counsel could evaluate whether the Board should recommend renewal of HW's contract.  Through his attorney, HW resisted all efforts to obtain a copy of his personnel file.

119.    Further, a majority of the Board refused to back some of the Directors' efforts to obtain HW's personnel file.  However, HW's counsel has represented that the Director Defendants had access to HW's personnel file and that they decided not to review it themselves.

120.    RW, as co-Chairman of the Companies, also had access to HW's personnel file and either intentionally chose not to review HW's personnel file, or reviewed HW's personnel file but failed to fully disclose the history and extent of HW's sexual misconduct out of personal and financial interests.

121.    Based upon information and belief, the Director Defendants were aware of multiple instances of HW's sexual assault prior to renewing HW's contract at the end of 2015, including but not limited to:

a.      In 2014, a Weinstein Co. temp employee, who had only worked at the Company for one day, complained that HW allegedly offered to boost her career in return for sexual favors.

b.      In March of 2015, a Filipina-Italian model reported that HW had groped her breasts and tried to stick his hand up her skirt when she met with him at a hotel in

New York City to discuss employment opportunities.  The complainant reported the sexual assault to the New York Police Department and cooperated with an investigation, even agreeing to meet with HW again at a hotel bar in order to secretly record him.  HW can be heard admitting to groping the victim's breast without her consent and that he was "used to that."  HW can also be heard pressing her to join him in his hotel room while he showers to avoid "embarrassing" him and to "not ruin their friendship."

c.      A young female employee had quit after complaining of being forced to arrange what she believed to be "honey pot" meetings for HW.

122.    Instead of investigating these claims of misconduct by HW or viewing HW's concealment of his personnel file as raising any red flags whatsoever, the Director Defendants unreasonably negotiated a new contract in 2015 for HW that placed no restrictions on his activities and took no steps to protect female employees and actresses seeking to conduct business with the Companies and HW.

123.    The Board was under no obligation to renew HW's contract.

124.    HW's contract was renewed by unanimous vote by the Director Defendants in or about November of 2015, despite their awareness of his repeated predatory conduct towards women.

125.    The Director Defendants' knowledge of multiple claims of sexual misconduct against HW is evidenced by the terms in HW's 2015 employment contract.[24]

126.    The 2015 contract required HW to indemnify the Companies for "any claim, action or incident that was described in [HW's] personnel file."

---

[24]      The 2015 employment contract is hereby incorporated by reference.

127. Moreover, the 2015 contract required HW to reimburse the Companies for "a payment to satisfy a claim that [HW] treated someone improperly in violation of the Company's Code of Conduct" – *i.e.* a payment related to HW's sexual misconduct.

128. In addition to reimbursing the Company for the payment, HW also had to pay $250,000 for the first instance of what it euphemistically termed "misconduct," $500,000 for a second instance, $750,000 for a third instance, and $1,000,000 for each instance thereafter.

129. The 2015 contract also required both a majority vote of the Board and approval of RW as co-Chairman before the Companies could terminate HW for a felony indictment involving fraud, dishonesty or moral turpitude or for a willful violation of the Code of Conduct that has caused serious harm to the Company.

130. The contract contains no provision for any penalties if HW personally covered the costs of any payments necessary to satisfy claims of improper treatment. Thus, pursuant to the contract, HW could continue engaging in sexual harassment and sexual misconduct with impunity provided that he paid the costs of any settlements personally and that he avoided disclosure of misconduct that might risk causing "serious harm" to the Companies.

131. HW's 2015 employment contract is signed by HW and RW as "Managers."

132. Based on information and belief, around the time of the renewal of HW's employment contract, in or about late October or November of 2015, a then-employee of the Companies wrote a memo outlining specific allegations of sexual harassment and misconduct against HW spanning a two-year period.

133. The employee, who was one of HW's assistants at the time, alleged that HW demanded a massage from a female employee while he was naked in a hotel room.

134.     She also described a broader "toxic environment for women" at the Companies and her fear that HW was using her and other female employees to facilitate liaisons with vulnerable women who hoped that he will get them work.

135.     Despite learning of the employee's allegations of a pattern of predatory behavior by HW towards women by the end of 2015, the Companies and the Director Defendants did not investigate these claims or did not take any remedial action to monitor, supervise or restrict HW whatsoever until HW's termination in October 2017 when news of HW's sexual misconduct was made public.

136.     The Director Defendants all had personal or financial reasons to not terminate HW or restrict his employment.

137.     As discussed above, RW is HW's brother and had a 21% equity share in the Companies along with $11 million dollars in debt.

138.     Dirk Ziff, a personal friend of HW, also loaned the Companies money, and after a major restructuring in 2019, his debt was exchanged for a large portion of the equity.[25]

139.     Tim Sarnoff is a senior executive at Technicolor, which owned over 6% of equity in the Companies.

140.     The Companies were also a customer of Technicolor, and Technicolor had extended credit on the services provided to the Companies.[26]

141.     Lance Maerov is senior executive at WPP Group USA, Inc., which reportedly made a $25 million investment in the Companies in 2005.[27]

---

[25]     Tully, supra note 20.

[26]     Id.

[27]     Holly Ware, *WPP Buys Stakes in Hollywood*, NEW YORK POST (Mar. 22, 2007, 9:00 AM), https://nypost.com/2007/03/22/wpp-buys-stakes-in-hollywood/(last accessed May 17, 2019).

142.    According to bankruptcy filings, Richard Koenigsberg is owed over $200,000 from the Companies, and he previously served as the personal accountant to HW and RW.

143.    Jeff Sackman, a Canadian movie producer, has collaborated with the Companies on various films which he served as an executive producer.

144.    Paul Tudor Jones, a long-time personal friend of HW, emailed HW after news outlets reported on Weinstein being a serial sexual abuser and told HW, "I love you" and the "good news is, this will go away sooner than you think and it will be forgotten!"[28]

145.    James Dolan is also a long-time personal friend of HW.  HW has publicly praised James Dolan as "one of my and Bob's best friends" when James Dolan left the board in June of 2016.[29]

146.    Tarak Ben Ammar was a director since the Companies' founding in 2005, and explained in a *Fortune* article the financial incentive to keep HW employed despite HW continuing to engage in sexual misconduct.

147.    In particular, there were talks in late-2014 to sell the television production venture headed by HW, and Tarak Ben Ammar explained, "The attitude of most of the directors was, 'We need Harvey, he's about to do this big fat deal with ITV.'"

148.    Thus, rather than restrict or terminate HW, the Director Defendants kept HW employed for personal and financial reasons.

149.    As a direct and proximate result of Defendants' unlawful conduct as alleged hereinabove, Plaintiff has suffered physical injury, severe emotional distress, humiliation, embarrassment, mental and emotional distress and anxiety, and economic harm.

---

[28]    Twohey et al, supra note 6.

[29]    Tully, supra note 20.

150.    The aforementioned conduct by Defendants was willful, wanton, and malicious. At all relevant times, Defendants acted with conscious disregard of the Plaintiff's rights and feelings.  Defendants also acted with the knowledge of or with reckless disregard for the fact that their conduct was certain to cause injury and/or humiliation to Plaintiff.  Plaintiff is further informed and believes that Defendants intended to cause fear, physical injury and/or pain and suffering to Plaintiff.  By virtue of the foregoing, Plaintiff is entitled to recover punitive and exemplary damages from Defendants according to proof.

### FIRST CAUSE OF ACTION
**(Sexual Battery in Violation of Cal. Civ. Code § 1708.5 Against Defendant Harvey Weinstein and the Companies)**

151.    Plaintiff repeats and realleges by reference each and every allegation contained hereinabove and incorporates the same herein as though fully set forth herein.

152.    Cal. Civ. Code Section 1708.5(a) provides: A person commits a sexual battery who does any of the following: (1) acts with the intent to cause a harmful or offensive contact with an intimate part of another, and a sexually offensive contact with that person directly or indirectly results; (2) acts with the intent to cause a harmful or offensive contact with another by use of his or her intimate part, and a sexually offensive contact with that person directly or indirectly results; or (3) acts to cause an imminent apprehension of the conduct described in paragraph (1) or (2), and a sexually offensive contact with that person directly or indirectly results.

153.    Cal. Civ. Code Section 1708.5(d) defines "intimate part" as the sexual organ, anus, groin, or buttocks of any person, or the breast of a female.

154.    Cal. Civ. Code Section 1708.5(f) defines "offensive contact" to mean contact that offends a reasonable sense of personal dignity.

155.     Plaintiff alleges that Defendant HW committed the act of civil sexual battery in violation of Cal. Civ. Code Section 1708.5, when on or about early 2016, Defendant, willfully, maliciously, intentionally, and without the consent of Plaintiff, subjected her to the forceful, harmful and/or offensive touching of Plaintiff's breasts, buttocks, and/or vagina, including viciously raping her by way of vaginal penetration against her will, without her consent, and in spite of her express objection.

156.     Plaintiff further alleges that the Companies are strictly liable for Defendant HW's actions under the principles of respondeat superior, as alleged herein and otherwise had advance knowledge that Defendant HW would engage in this despicable conduct while acting within the scope of his employment and by their actions and inactions ratified, authorized and condoned this unlawful behavior.

157.     As a direct and/or proximate result of HW's unlawful conduct as alleged hereinabove, Plaintiff has suffered physical injury, severe emotional distress, humiliation, embarrassment, mental and emotional distress and anxiety.

158.     As a direct and proximate result of Defendants' unlawful conduct as alleged hereinabove, Plaintiff has suffered economic harm, loss of earnings, and other damages.

159.     The aforementioned conduct by Defendants was willful, wanton, and malicious. At all relevant times, Defendants acted with conscious disregard of the Plaintiff's rights and feelings.  HW also acted with the knowledge of or with reckless disregard for the fact that his conduct was certain to cause injury and/or humiliation to the Plaintiff.  Plaintiff is further informed and believes that Defendants intended to cause fear, physical injury and/or pain and suffering to the Plaintiff.  By virtue of the foregoing, the Plaintiff is entitled to recover punitive and exemplary damages from Defendants according to proof at trial.

## SECOND CAUSE OF ACTION
### (Gender Violence in Violation of Cal. Civ. Code § 52.4 Against
### Defendant Harvey Weinstein)

160.    Plaintiff repeats and realleges by reference each and every allegation contained hereinabove and incorporates the same herein as though fully set forth herein.

161.    Cal. Civ. Code Section 52.4(c) defines "gender violence" as: (1) one or more acts that would constitute a criminal offense under state law that has as an element the use, attempted use, or threatened use of physical force against the person or property of another, committed at least in part based on the gender of the victim, whether or not those acts have resulted in criminal complaints, charges, prosecution, or conviction;  or (2) Physical intrusion or physical invasion of a sexual nature under coercive conditions, whether or not those acts have resulted in criminal charges, complaints, charges, prosecution, or conviction.   Cal. Civ. Code Section 52.4(e) provides:  Notwithstanding any other laws that may establish the liability of an employer for the acts of an employee, this section does not establish any civil liability of a person because of his or her status as an employer, unless the employer personally committed an act of gender violence.

162.    Plaintiff alleges that, on or about early 2016, and prior to that, Defendant HW violated Cal. Civ. Code Section 52.4 in that one or more acts he inflicted on Plaintiff constitutes a criminal offense under state law that has an element of use, attempted use, or threatened use of physical force against her person, committed at least in part based on Plaintiff's gender, whether or not those acts have resulted in criminal complaints, charges, prosecution, or conviction.

163.    Plaintiff alleges that, on or about early 2016, and prior to that, Defendant HW violated Cal. Civ. Code Section 52.4 in that he engaged in a physical intrusion or physical

invasion of a sexual nature under coercive conditions, even if those acts have not yet resulted in criminal complaints, charges, prosecution, or conviction.

164.    As a direct and proximate result of Defendant's unlawful conduct as alleged hereinabove, Plaintiff has suffered physical injury, severe emotional distress, humiliation, embarrassment, mental and emotional distress and anxiety, all in an amount exceeding the jurisdictional minimum of the Superior Court according to proof at trial.

165.    As a direct and proximate result of Defendant's unlawful conduct as alleged hereinabove, Plaintiff has suffered economic harm and other consequential damages, all in an amount according to proof at trial.

166.    The aforementioned conduct by Defendant was willful, wanton, and malicious. At all relevant times, Defendant acted with conscious disregard of the Plaintiff's rights and feelings.  Defendant also acted with the knowledge of or with reckless disregard for the fact that his conduct was certain to cause injury and/or humiliation to the Plaintiff.  Plaintiff is further informed and believes that Defendant intended to cause fear, physical injury and/or pain and suffering to the Plaintiff.  By virtue of the foregoing, the Plaintiff is entitled to recover punitive and exemplary damages from Defendants according to proof at trial.

167.    Plaintiff has incurred, and will continue to incur, attorneys' fees in the prosecution of this action and therefore demands such reasonable attorneys' fees and costs as set by the Court.

### THIRD CAUSE OF ACTION
**(Battery Against Defendant Harvey Weinstein and the Companies)**

168.    Plaintiff repeats and realleges by reference each and every allegation contained hereinabove and incorporates the same herein as though fully set forth herein.

169.   In performing the acts described herein, Defendant HW acted with the intent to make a harmful and offensive contact with Plaintiff's person.

170.   Defendant HW did, in fact, bring himself into offensive and unwelcome contact with Plaintiff as described hereinabove.

171.   At all relevant times, Plaintiff found the contact by Defendant to be offensive to her person and dignity.  At no time did Plaintiff consent to any of the acts by Defendant alleged hereinabove.

172.   As a result of Defendant HW's acts as hereinabove alleged, Plaintiff was physically harmed and/or experienced offensive contact with her person.

173.   Plaintiff further alleges that the Companies are strictly liable for Defendant HW's actions under the principles of respondeat superior, as alleged herein and otherwise had advance knowledge that Defendant HW would engage in this despicable conduct while acting within the scope of his employment and by their actions and inactions ratified, authorized and condoned this unlawful behavior.

174.   As a direct and proximate result of Defendants' unlawful conduct as alleged hereinabove, Plaintiff has suffered physical injury, severe emotional distress, humiliation, embarrassment, mental and emotional distress and anxiety, economic harm and other consequential damages.

175.   The aforementioned conduct by Defendants was willful, wanton, and malicious. At all relevant times, Defendants acted with conscious disregard of the Plaintiff's rights and feelings.  Defendants also acted with the knowledge of or with reckless disregard for the fact that their conduct was certain to cause injury and/or humiliation to the Plaintiff.  Plaintiff is further informed and believes that Defendants intended to cause fear, physical injury and/or pain and

suffering to the Plaintiff.  By virtue of the foregoing, the Plaintiff is entitled to recover punitive and exemplary damages from Defendants according to proof at trial.

## FOURTH CAUSE OF ACTION
### (Assault Against Defendant Harvey Weinstein and the Companies)

176.    Plaintiff repeats and realleges by reference each and every allegation contained hereinabove and incorporates the same herein as though fully set forth herein.

177.    When Defendant HW charged at Plaintiff, HW intended to cause Plaintiff apprehension of an imminent harmful and offensive contact with her person.

178.    As a result of Defendant HW's acts, Plaintiff was in fact, placed in great apprehension of imminent harmful and offensive contact with her person.

179.    In performing the acts alleged hereinabove, Defendant HW acted with the intent of making contact with Plaintiff's person.

180.    At no time did Plaintiff consent to any of the acts by HW alleged hereinabove.

181.    Defendant HW's conduct as described above, caused Plaintiff to be apprehensive that Defendant would subject her to further intentional invasions of her right to be free from offensive and harmful contact and demonstrated that at all times material herein, Defendant had a present ability to subject her to an intentional offensive and harmful touching.

182.    Plaintiff further alleges that the Companies are strictly liable for Defendant HW's actions under the principles of respondeat superior, as alleged herein and otherwise had advance knowledge that Defendant HW would engage in this despicable conduct while acting within the scope of his employment and by their actions and inactions ratified, authorized and condoned this unlawful behavior.

183.    As a direct and proximate result of Defendants' unlawful conduct as alleged hereinabove, Plaintiff has suffered physical injury, severe emotional distress, humiliation, embarrassment, mental and emotional distress and anxiety, and economic harm.

184.    The aforementioned conduct by Defendants was willful, wanton, and malicious. At all relevant times, Defendants acted with conscious disregard of the Plaintiff's rights and feelings.  Defendants also acted with the knowledge of or with reckless disregard for the fact that their conduct was certain to cause injury and/or humiliation to the Plaintiff.  Plaintiff is further informed and believes that Defendants intended to cause fear, physical injury and/or pain and suffering to the Plaintiff.  By virtue of the foregoing, the Plaintiff is entitled to recover punitive and exemplary damages from Defendants according to proof.

### FIFTH CAUSE OF ACTION
### (Sex Trafficking Against Defendant Harvey Weinstein and the Companies)

185.    Plaintiff repeats and realleges by reference each and every allegation contained hereinabove and incorporates the same herein as though fully set forth herein.

186.    Defendant HW enticed women, including Plaintiff, to attend meetings with him based on the fraudulent promise of providing them with roles in film and television productions.

187.    The opportunity to have a private meeting with Defendant HW to discuss a role on a film or television production carries value because such opportunity can be career-making and life-changing.

188.    Defendant HW enticed Plaintiff to his hotel room based on the false pretenses to discuss and cast her in a role in one of the Companies' television series.

189.    Defendant HW committed sexual acts with Plaintiff by masturbating while touching Plaintiff and having intercourse with Plaintiff without her consent.

190.    HW and the Companies formed a venture as defined by 18 U.S.C. § 1591 since they constituted a "group of two or more individuals associated in fact, whether or not a legal entity."

191.    The Companies benefited from participation in the venture because the Companies received value from HW's services and benefited financially from his continued employment.

192.    The Companies knew that HW engaged in a pattern and practice of luring women into pretextual meetings and then forcing them to engage in sexual acts.

193.    The Companies participated in HW's sex-trafficking venture by knowingly assisting and facilitating HW with the resources and authority to engage in the sexual assaults and by helping to clean up after and cover up the sexual assaults, including entering into non-disclosure agreements with woman victimized by HW's sexual assaults.

194.    The Companies also paid for HW's interstate travel and the premises where the sexual assaults were committed.

195.    HW continued to be employed by the Companies because the Companies provided him with the authority and resources to engage in sexual misconduct.

196.    Had the Companies refused to provide HW with the authority and resources to facilitate his sexual acts, HW would likely not have remained at the Companies and the Companies would have suffered severe financial consequences if he left.

197.    The Companies also permitted HW to continue to engage in sexual acts under his 2015 employment agreement so long as his actions did not cause "serious harm" to the Companies.

198.   The Companies benefited from their participation because it allowed HW to continue to produce film and television productions so that the Companies would continue to make money or receive financing.

199.   As a direct and proximate result of Defendants' unlawful conduct as alleged hereinabove, Plaintiff has suffered physical injury, severe emotional distress, humiliation, embarrassment, mental and emotional distress and anxiety, economic harm and other consequential damages.

200.   Plaintiff also seeks reasonable attorneys' fees as provided under 18 U.S. Code § 1595(a).

## SIXTH CAUSE OF ACTION
### (Negligence Against All Defendants)

201.   Plaintiff repeats and realleges by reference each and every allegation contained hereinabove and incorporates the same herein as though fully set forth herein.

202.   Defendants committed the negligent actions and/or negligent failures to act, as set forth hereinabove and those acts proximately caused the emotional, physical, and financial injuries visited upon Plaintiff.

203.   Each Defendant owed Plaintiff a duty of care to refrain from conduct that imposed an unreasonable risk of injury to her.

204.   Based on prior complaints, each Defendant knew or reasonably should have known that HW would use his position at the Companies to lure Plaintiff to a hotel room under the guise of discussing business opportunities to sexually harass, batter, and assault her.

205.   Defendants breached this duty of care by way of their own conduct as alleged herein.  Specifically, Defendants failed to take any steps, such as forbidding HW from meeting

with women alone in hotel rooms to conduct alleged Company business, to avoid this reasonably foreseeable harm.

206.   Defendant RW's prior acts of covering up for HW's sexual misconduct with female employees and actresses created a continuing risk of HW engaging in similar sexual misconduct.

207.   RW, based on his familiar relationship and position within the Companies, had knowledge of the peculiar conditions that provided HW with the authority and resources to engage in sexual misconduct with female employees and actresses.

208.   RW had knowledge that HW continued to engage in sexual misconduct and that HW had the temptation or opportunity to engage in sexual misconduct.

209.   The harm from HW's sexual misconduct was grave and caused significant physical and mental harm on often naïve and vulnerable female employees and aspiring actresses.

210.   RW knew that the Companies' human resources department was completely ineffectual to protect female employees and actresses from HW's sexual misconduct, and that the Companies' Board of Directors all had personal and financial interests to not take any action to modify the conditions or stop HW from continuing to use his authority and resources within the Companies to engage in sexual misconduct.

211.   Defendant RW's actions and awareness of HW's continued sexual misconduct created a duty under California and/or New York law for him to exercise reasonable care to alleviate the risk that HW posed to female employees and actresses.

212.    Defendant RW failed to take any action to warn or otherwise reduce the risk that HW would use his position of power to continue to engage in sexual misconduct with female employees and actresses.

213.    The burden on Defendant RW to take some action to warn or otherwise reduce the risk of HW's sexual misconduct was slight.

214.    As a direct and proximate result of Defendant RW's conduct, as alleged hereinabove, Plaintiff has suffered physical injury, severe emotional distress, humiliation, embarrassment, mental and emotional distress and anxiety, and economic harm

### SEVENTH CAUSE OF ACTION
**(Negligent Retention or Supervision Against All Defendants)**

215.    Plaintiff repeats and realleges by reference each and every allegation contained hereinabove and incorporates the same herein as though fully set forth herein.

216.    The Companies and Director Defendants employed HW since they all had the power to hire and fire HW, set his pay and control his work conditions.

217.    Defendants had a mandatory duty of care to properly hire, train, retain, supervise, and discipline their employees so as to avoid unreasonable harm to citizens.  With deliberate indifference, Defendants failed to take necessary, proper or adequate measures in order to prevent the violation of Plaintiff's rights and injury to Plaintiff.  Among other acts and/or failures to act, Defendants retained Defendant HW, renegotiated his employment contract, and did not terminate him despite knowledge of, or reckless disregard for, Defendant HW's propensity for the conduct which caused harm to Plaintiff.

218.    Defendants breached this duty of care by failing to adequately train employees to not sexually discriminate and/or harass women.  This lack of adequate supervisory training and/or policies and procedures demonstrates a failure to make reasonable attempts and to prevent

sexually discriminatory behavior toward women.  In addition, the retention of Defendant HW despite his well-known predatory pattern of abuse and harassment was negligent.

219.    Defendants had a duty to control Defendant HW in his interactions with women during meetings taking place in hotel rooms paid for by Defendants during meetings set up through use of a phone paid for by the Companies to prevent the reasonably foreseeable harm that he would sexually harass and/or sexually assault them.

220.    Defendants' negligent supervising and/or retaining of Defendant HW was a substantial factor in causing Plaintiff's harm.

221.    Defendant HW engaged in unlawful conduct on Defendants' property and/or using Defendants' chattels, which conduct was outside the scope of his employment.

222.    The Director Defendants' conduct constituted gross negligence.

223.    As a direct and proximate result of Defendants' unlawful conduct, Plaintiff has suffered emotional distress, humiliation, and embarrassment, economic harm, all in an amount to be determined at trial.

224.    The aforementioned conduct by Defendants was willful, wanton, and malicious. At all relevant times, Defendants acted with conscious disregard of the Plaintiff's rights and feelings.  The Companies were aware of the probable dangerous consequences of retaining or inadequately supervising Defendant HW and allowing him to meet with women under the guise of procuring work for them in his role as a representative of the Companies.  Defendants acted with the knowledge of or with reckless disregard for Defendant HW's propensity for the conduct that caused harm to Plaintiff.  By virtue of the foregoing, the Plaintiff is entitled to recover punitive and exemplary damages from Defendants according to proof at trial.

**WHEREFORE**, Plaintiff prays judgment be entered in her favor against Defendants, and each of them, as follows:

1.     For a money judgment representing compensatory damages including consequential damages, lost wages, earning, and all other sums of money, together with interest on these amounts, according to proof;

2.     For an award of money judgment for mental pain and anguish and severe emotional distress, according to proof;

3.     For punitive and exemplary damages according to proof;

4.     For attorneys' fees and costs;

5.     For prejudgment and post-judgment interest; and

6.     For such other and further relief as the Court may deem just and proper.

Dated: May 17, 2019
New York, New York

WIGDOR LLP

By: _____
Douglas H. Wigdor
Bryan L. Arbeit
WIGDOR LLP
85 Fifth Avenue
New York, New York 10003
Telephone: (212) 257-6800
dwigdor@wigdorlaw.com
barbeit@wigdorlaw.com

THE LAW OFFICE OF KEVIN MINTZER, P.C.
Kevin Mintzer
1350 Broadway, Suite 1400
New York, New York 10018
Telephone: (646) 843-8180
km@mintzerfirm.com

*Attorneys for Plaintiff Wedil David*