UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

WEDIL DAVID, an Individual,

Plaintiff,

v.

THE WEINSTEIN COMPANY LLC;
THE WEINSTEIN COMPANY HOLDINGS
LLC; HARVEY WEINSTEIN; and ROBERT
WEINSTEIN,

Defendants.

---

Index No. 1:18-cv-05414 (RA)

## PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT HARVEY WEINSTEIN'S MOTION TO DISMISS

**WIGDOR LLP**

Douglas H. Wigdor
Bryan L. Arbeit

85 Fifth Avenue
New York, New York 10003
dwigdor@wigdorlaw.com
barbeit@wigdorlaw.com

**THE LAW OFFICE OF KEVIN MINTZER, P.C.**

Kevin Mintzer

1350 Broadway, Suite 1400
New York, New York 10018
km@mintzerfirm.com

*Attorneys for Plaintiff Wedil David*

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ..................................................................................................... ii

PRELIMINARY STATEMENT ............................................................................................... 1

FACTUAL BACKGROUND ................................................................................................... 3

           Procedural History ................................................................................................... 5

ARGUMENT ............................................................................................................................ 6

I.      The Plain Meaning of the TVPA, Not Its Legislative History, Controls This Case ............ 8

II.     Plaintiff Plausibly Alleges That She Was Forced to Participate in a Commercial
         Sex Act ........................................................................................................................ 10

CONCLUSION ........................................................................................................................ 16

i

## <u>TABLE OF AUTHORITIES</u>

<u>Cases</u>

Ashcroft v. Iqbal,
129 S. Ct. 1937 (2009) ................................................................................. 6

Bell Atl. Corp. v. Twombly,
550 U.S. 544 (2007) ...................................................................................... 6

Canosa v. Ziff,
No. 18 Civ. 4115, 2019 WL 498865 (S.D.N.Y. Jan. 28, 2019) ............... 9, 11, 12, 15

Frangipani v. HBO,
08 Civ. 5675, 2010 WL 1253609 (S.D.N.Y. Mar. 16, 2010) ..................... 6

Geiss v. Weinstein Co. Holdings LLC,
17 Civ. 9554, 2019 WL 1746009 (S.D.N.Y. Apr. 18, 2019) .................... 11, 12

Gonzales v. Raich,
545 U.S. 1 (2005) ......................................................................................... 13

Huett v. Weinstein Co. LLC,
No. 18 Civ 06012, 2018 WL 6314159 (C.D. Cal. Nov. 5, 2018) ............. 9, 11

Kolbek v. Twenty First Century Holiness Tabernacle Church, Inc.,
10-Civ-4124, 2013 WL 6816174 (W.D. Ark. Dec. 24, 2013) .................. 15

Lawrence + Mem'l Hosp. v. Burwell,
812 F.3d 257 (2d Cir. 2016) ........................................................................ 8

Mamani v. Berzain,
825 F.3d 1304 (11th Cir. 2016) ................................................................... 8

Noble v. Weinstein,
335 F. Supp. 3d 504 (S.D.N.Y. 2018) ................................................. *passim*

Peyton v. Rowe,
391 U.S. 54, (1968) ...................................................................................... 11

Saks v. Franklin Covey Co.,
316 F.3d 337 (2d Cir.2003) .......................................................................... 8

United States v. Campbell,
111 F. Supp.3d 340 (W.D.N.Y. 2015) ......................................................... 13

United States v. Estrada-Tepal,
57 F.Supp.3d 164 (E.D.N.Y. 2014) ............................................................. 9

United States v. Jungers,
    702 F.3d 1066 (8th Cir. 2013) ................................................................. 10

United States v. Raniere,
    18 Cr. 2041, 2019 WL 1903365 (E.D.N.Y. Apr. 29, 2019) ........................................ 12, 13, 15

United States v. Reed,
    2017 WL 3208458 (D.D.C. July 27, 2017) ............................................................. 14

United States v. Rivera,
    12 Cr. 121, 2012 WL 6589526 (M.D. Fla. Dec. 18, 2012) ...................................... 12

## Other Authorities

18 U.S.C. 1595(a) ................................................................................. 9

18 U.S.C. § 1591 ................................................................................. *passim*

18 U.S.C. § 2423(c) ............................................................................. 13

Plaintiff Wedil David respectfully submits this memorandum of law in opposition to Defendant Harvey Weinstein's motion to dismiss Plaintiff's Fifth Cause of Action under the Third Amended Complaint ("TAC") for Sex Trafficking, pursuant to Fed. R. Civ. P. 12(b)(6).

## PRELIMINARY STATEMENT

Harvey Weinstein used his power and influence in the entertainment industry to lure Wedil David, an actor, to meet with him twice at a hotel in California where he regularly did business on behalf of The Weinstein Company.  Ostensibly these meetings were to discuss career opportunities for David, but Weinstein had an ulterior motive in mind, a quid pro quo: his professional assistance in exchange for sex.  Having enticed David to meet with him based on assurances of career assistance and to celebrate a new television role on one of his programs, Weinstein eventually extracted what he wanted from her, subjecting her to sexual abuse and later to forcible rape.  Unbeknownst to David, Weinstein had apparently repeated this predatory pattern many times before, leveraging his high position to force women in his industry to submit to his sexual demands.  Based on Weinstein's conduct, David has stated a claim against him in her Third Amended Complaint for Sex Trafficking under the Trafficking Victims Protection Act ("TVPA"), 18 U.S.C. § 1591.

Weinstein has moved to dismiss that claim, advancing the very same meritless arguments that have previously been rejected by four different federal judges, including three in this District.  Pointing to snippets of the TVPA's legislative history, Weinstein asserts that David's complaint cannot qualify as sex trafficking because David was not forced into slavery, involuntary servitude or prostitution.  But regardless of whether Congress had those trafficking archetypes in mind when it passed the TVPA, the statute Congress *actually passed* prohibits vastly more conduct than what Weinstein suggests, a fact that every court to have considered the

issue has recognized.  Because this Court is bound to apply the plain meaning of the TVPA, and the statute on its face is not limited to forced slavery or similar offenses, Weinstein's attempt to recast the statute to exempt him from liability should be rejected.

Turning to the elements of David's claim, Weinstein's only basis for dismissal is that Plaintiff has not alleged a "commercial sex act" as defined by the statute.  But that term, defined as a "sex act, on account of which anything of value is given to or received by any person," is properly pleaded in the TAC.  The opportunity for an actor to meet with a powerful film executive such as Weinstein to discuss her career is a thing of significant value, as is the assurance that she would be cast in a role on a major television series.  While Weinstein suggests that David was required to plead that she actually received money or a more tangible benefit in order to establish her TVPA claim, there is no such requirement in the statute, and every court that has considered the issue has so held.

Unable to present any meritorious legal arguments of dismissal, Weinstein resorts to unfounded attacks on David for not bringing her TVPA claim in earlier versions of her complaint.  However, the judicial consensus supporting David's TVPA claim has only crystalized over the past year.  Thus, it was reasonable for David to defer pursuing her TVPA claim until now.  Weinstein cannot claim that he was prejudiced by this because discovery has not commenced, and the case against him will proceed before this Court regardless of whether a trafficking claim is included.  Accordingly, Weinstein's motion to dismiss should be denied.

## FACTUAL BACKGROUND[1]

Defendant Harvey Weinstein ("Weinstein") was the co-Chairman and co-CEO of the Weinstein Company Holdings, LLC and Weinstein Co. (collectively, "TWC" or the "Companies") from 2005 to October 2017.  ¶ 23.  During this time, Weinstein wielded enormous power and influence in the film industry.  Id.

Plaintiff Wedil David met Harvey Weinstein in 2011 at an event held by the Weinstein Co.  ¶ 24.  Once Weinstein found out that Plaintiff was an actress, he said he would try to help her with her career.  ¶ 25.  Over the next few years, Weinstein invited Plaintiff to attend award show parties that the Weinstein Co. hosted, and he maintained regular communication with Plaintiff every few months thereafter.  ¶ 26.  Weinstein used a phone paid for by the Companies to communicate with her and to discuss potential job opportunities.  ¶ 27.

In late 2015, Plaintiff met Weinstein at the Montage Hotel in Beverly Hills, California to discuss a prospective acting job on a television show called "Marco Polo," as well as acting in two to three other projects.  ¶ 28.  Weinstein and his brother Robert Weinstein, who was the co-chairman and co-CEO of TWC, served as executive producers on Marco Polo.  Id.  Harvey and Robert Weinstein, as well as the Companies, held a financial interest in the performance of Marco Polo and maintained control over how the program would be made and distributed.  ¶ 29.

During this meeting, Weinstein told David that he wanted her to do voiceover work because her voice was "soft and sexy," and he also said he had another movie role that he would cast her in.  ¶ 30.  At some point in the same meeting, Weinstein said he wanted to masturbate in front of her.  ¶ 31.  Plaintiff told Weinstein that she did not want him to masturbate in front of

---

[1]     The following facts are taken from the Plaintiff's Third Amended Complaint.  Paragraph citations ("¶ #"), unless otherwise indicated, refer to the TAC, Dkt. No. 161.

her.  Id.  Weinstein told her that he would not touch her, but "only" wanted her to watch him.
¶ 32.  Despite her telling Weinstein "no," he proceeded to grip her wrist with one hand while
using the other to masturbate in front of her until completion.  Id.

In early spring of 2016, Weinstein contacted Plaintiff again to meet with him at the
Montage Hotel in Beverly Hills to celebrate her upcoming role in Marco Polo, giving her the
impression that she had been chosen for the part.  ¶ 33.  David agreed to meet with Weinstein
because she had already had several phone calls and emails with the Companies' employees
about a role on Marco Polo, including speaking with a producer for Marco Polo.  ¶ 34.  When
David arrived at Weinstein's hotel room, there were scripts all over the hotel room and
Weinstein said he was exhausted from meetings all day.  ¶ 35.

At some point during this meeting, Weinstein excused himself and returned wearing a
bathrobe.  ¶ 36.  Before David could leave, Weinstein grabbed her and pulled her into the
bedroom.  Id.  Plaintiff told Weinstein that she did not want to do anything sexual with him.
¶ 37.  He forcefully threw Plaintiff onto the bed.  He pulled down her jeans and started to orally
copulate her.  Id.  Plaintiff pushed Weinstein's head off of her and told him, "Stop!"  Id.
Weinstein then used his massive weight and strength to force himself on her, pushing his penis
inside of her vagina without a condom.  Id.  After he withdrew, he gripped her with one hand
while using his other hand to masturbate.  Id.  Plaintiff finally broke free from his grasp and
immediately left the bedroom and suite.  Id.

Weinstein contacted Plaintiff thereafter and acted as if nothing had happened.  ¶ 38.   He
told her he was coming to Los Angeles.  Id.  Plaintiff swore at him and hung up the phone.  Id.
Plaintiff never received a job offer for the Marco Polo project, even though she had been
previously told that she would be a perfect addition for the show.  ¶ 39.  Nor did she receive any

offers for other projects that Weinstein had discussed with her.  Id.  Weinstein used TWC's credit cards to pay for his hotel rooms at the Montage and used TWC's travel agent to book his travel and hotel stays.  ¶ 40.

Weinstein's conduct toward David was clearly part of a pattern.  Indeed, for decades, Weinstein engaged in a pattern and practice of sexually harassing female employees and applicants, as well as actresses, seeking professional opportunities from him.  ¶ 88.  Specifically, over the course of more than twenty years, Weinstein sexually harassed numerous women, including at least three women who reported having been raped by Weinstein and four who reported other kinds of assault.  ¶ 89.  In addition, at least sixteen former and current employees of the Companies reported witnessing or having knowledge of unwanted sexual advances and touching by Weinstein at events associated with Weinstein's films and in the workplace.  ¶ 90. Weinstein's sexual misconduct was widely known within TWC and Weinstein's previous company, Miramax.  ¶ 90.  Despite learning of the employees' allegations of a pattern of predatory behavior by Weinstein towards women by the end of 2015, TWC's officers, directors and employees did not investigate these claims or take any remedial action until Weinstein's termination in October 2017 when news of Weinstein's sexual misconduct was made public. ¶¶ 91-125.

**Procedural History**

On November 14, 2017, Plaintiff, by prior counsel, filed this action in California Superior Court, against Weinstein, the Weinstein Companies and various John Doe defendants.  Dkt. No. 1 at Ex. A.  Plaintiff filed an Amended Complaint on January 2, 2018.  Id.  On May 21, 2018, one of the Defendants filed a motion to transfer the action to the Southern District of New York, which was unopposed and granted on June 14, 2018.  Dkt. Nos. 17, 27.

On August 15, 2018, Plaintiff, still represented by prior counsel, moved for leave to file a Second Amended Complaint.  Dkt. No. 15.  That motion was unopposed and granted by the Court, Dkt. No. 76, and the Second Amended Complaint was filed by Plaintiff's current counsel on October 17, 2018.  Dkt. No. 81.  Following briefing on motions to dismiss the Second Amended Complaint made by Defendants other than Harvey Weinstein, and the Court's decision granting those motions, Dkt. No. 142, Plaintiff filed a Third Amended Complaint on May 17, 2019, Dkt. No.147, which contained a claim under the Trafficking Victims Protection Act, 18 U.S.C. § 1591, against Harvey Weinstein and the Weinstein Companies.  A corrected version of the Third Amended Complaint was filed, pursuant to the Court's Order, on June 6, 2019.  Dkt. No. 164.  Weinstein filed a motion to dismiss that claim on June 21, 2019.  Dkt. No. 164.

## ARGUMENT

To survive a motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  Ashcroft v. Iqbal, 129 S. Ct. 1937, 1949 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  Id.  In making this determination, a court must "liberally construe the complaint, accepting the factual allegations as true, and drawing all reasonable inferences in Plaintiff's favor."  Frangipani v. HBO, 08 Civ. 5675, 2010 WL 1253609, at *2 (S.D.N.Y. Mar. 16, 2010).

Weinstein advances two arguments in support of his motion to dismiss David's claim under 18 U.S.C. § 1591.  First, he contends that the stated purpose and legislative history of the statute purportedly demonstrates that it should only be applied in cases involving "the sale of women and minors, drugging and kidnapping, smuggling women and minors, and forced

prostitution." (Def's Br. at 5)  But the language of the TVPA controls this case, not its legislative history.  As multiple courts have recognized, the broadly-worded statute covers coercive sexual conduct in a commercial context and is not limited to cases involving slavery, involuntary servitude or prostitution.

Second, Weinstein asserts that Plaintiff's claim under the TVPA fails to allege a "commercial sex act" within the meaning of the statute.  However, the TAC in fact alleges that Weinstein provided David something of value in exchange for the sexual activity that he forced her to participate in; namely, the opportunity to have a private meeting with Weinstein to discuss a role on a film or television production, a meeting that Plaintiff reasonably believed could be career-making and life-changing, as well as an assurance that David had been cast in Marco Polo.  Therefore, David has satisfied the "commercial sex act" element of her TVPA claim.

Weinstein acknowledges that his arguments have been rejected by three different judges of this court, but he maintains that the first such ruling by Judge Sweet was erroneous, and the subsequent decisions by Judge Engelmayer and Judge Hellerstein blindly followed Judge Sweet as part of a "dangerous domino effect."  Not so.  Weinstein's arguments were independently considered and rejected by these judges because they are unpersuasive and incorrect, not because of any improper judicial herding.  Furthermore, contrary to Weinstein's suggestion, there is nothing at all improper about Plaintiff amending her Complaint to add a claim under the TVPA against Weinstein and the Weinstein Companies in light of the judicial consensus that has emerged regarding the statute after Plaintiff sought permission to file her Second Amended Complaint. Accordingly, Weinstein's motion should be denied.

**I**.        <u>**The Plain Meaning of the TVPA, Not Its Legislative History, Controls This Case**</u>

Relying entirely on a House of Representative committee report from when the TVPA

was originally passed in 2000, Weinstein asserts that the statute is meant only to apply to cases

involving slavery, involuntary servitude or other archetypes of human trafficking, and that

allowing Plaintiff to proceed with a TVPA claim would amount to "utter perversion of the

legislative intent behind the statute."  Def's Br.  5.  But Weinstein's argument ignores basic rules

of statutory construction.  When interpreting a statutory provision, a court must begin with the

language of the statute.  <u>Saks v. Franklin Covey Co.</u>, 316 F.3d 337, 345 (2d Cir.2003) ("Every

exercise in statutory construction must begin with the words of the text.").  If the terms are

unambiguous, the law should be interpreted according to the plain meaning of its words.  <u>Id.</u>

Furthermore, when a statute's meaning is clear, legislative history is not relevant.  <u>See</u> <u>Lawrence</u>

<u>+ Mem'l Hosp. v. Burwell</u>, 812 F.3d 257, 266 (2d Cir. 2016) (noting that "our view of the

statute's plain meaning trumps any resort to legislative history");  <u>Mamani v. Berzain</u>, 825 F.3d

1304, 1311 (11th Cir. 2016) ("Nor will we entertain the defendants' attempts to use the

legislative history to manufacture ambiguity in the text.")

The TVPA provides, in relevant part:

(a) Whoever knowingly—

(1) in or affecting interstate or foreign commerce, or within the
special maritime and territorial jurisdiction of the United States,
recruits, entices, harbors, transports, provides, obtains, advertises,
maintains, patronizes, or solicits by any means a person; or

(2) benefits, financially or by receiving anything of value, from
participation in a venture which has engaged in an act described in
violation of paragraph (1),

knowing, or, except where the act constituting the violation of
paragraph (1) is advertising, in reckless disregard of the fact, that
means of force, threats of force, fraud, coercion described in

subsection (e)(2), or any combination of such means will be used to cause the person to engage in a commercial sex act, or that the person has not attained the age of 18 years and will be caused to engage in a commercial sex act, shall be punished . . .

18 U.S.C.A. § 1591.

The statute further defines the term "commercial sex act" to mean a "sex act, on account of which anything of value is given to or received by any person."  18 U.S.C. § 1591(e)(3).  In 2003, Congress added a private right of action for TVPA victims.  18 U.S.C. 1595(a) ("An individual who is a victim of a violation of Section . . . 1591 of title 18, United States Code, may bring a civil action in any appropriate district court of the United States.); Noble v. Weinstein, 335 F. Supp. 3d 504, 514 (S.D.N.Y. 2018).

Nothing in the text of the TVPA supports Weinstein's contention that the statute should be understood to cover only forced slavery and similar offenses.  See Canosa v. Ziff, No. 18 Civ. 4115, 2019 WL 498865, at *23 (S.D.N.Y. Jan. 28, 2019) (rejecting "self-serving" argument of the Weinstein Companies that TVPA reached "only caricatures of child slavery, and . . . exclude[d] corporate-supported conduct."); United States v. Estrada-Tepal, 57 F.Supp.3d 164, 167 (E.D.N.Y. 2014) ("18 U.S.C. § 1591 unambiguously covers a broad range of conduct with no requirement that a defendant intend to further any underlying sex trafficking scheme.").

In fact, the words "slavery," "involuntary servitude," "prostitution," and even "trafficking" are nowhere to be found in the text of 18 U.S.C. §§ 1591 and 1595.  Instead, Congress employed "expansive" language in those sections – including using the words "whoever," "any," or "anything of value" – demonstrating that Congress intended for the TVPA to apply to a broad range of conduct in which a victim is coerced into a sex act as part of a commercial or business exchange.  Noble, 335 F. Supp. 3d at 516; Huett v. Weinstein Co. LLC, No. 18 Civ 06012, 2018 WL 6314159, at *1 (C.D. Cal. Nov. 5, 2018); see also Estrada-Tepal, 57

9

F. Supp. 3d at 168 ("The plain language of the statute requires only that a person have knowledge that he or she is committing any of the seven prohibited actions enumerated in 18 U.S.C. § 1591(a)(1) and knowledge, or reckless disregard of the fact, that a person subject to any of the prohibited actions will engage in an underage or coerced commercial sex act"); United States v. Jungers, 702 F.3d 1066, 1070 (8th Cir. 2013) ("[D]efendants repeatedly assert § 1591(a)(1) is aimed exclusively at organized sex-trafficking rings or ventures that profit from the illicit sex trade. While § 1591 undoubtedly targets such organizations, the language in § 1591 indicates Congress also targeted individual acts of trafficking.").

Accordingly, the Court should reject Weinstein's argument that the TVPA is not intended to apply to the conduct alleged by David.

## II.    Plaintiff Plausibly Alleges That She Was Forced to Participate in a Commercial Sex Act

Weinstein tacitly concedes that David has plausibly alleged all but one element of her TVPA claim.[2]  The only deficiency that Weinstein identifies in her claim is that David has not alleged that she participated in a commercial sex act, as defined by the TVPA, because the TAC purportedly fails to allege that money or anything of value was exchanged between himself and David. Def's Br.  7-8.  But Weinstein's argument has been rejected by every court to consider it, and it should likewise be turned aside here.

---

[2]      As stated in Noble, 335 F. Supp. 3d at 515, to state a claim under the TVPA, David must plausibly plead that Weinstein "knowingly and in interstate or foreign commerce: (1) recruited, enticed, harbored, transported, provided, obtained, or maintained by any means a person; (2) 'knowing, or in reckless disregard of the fact, that means of force, threats of force, fraud ... or any combination of such means will be used'; (3) 'to cause the person to engage in a commercial sex act.'"  Id. (quoting 18 U.S.C. § 1591).  Here, Weinstein does not dispute that the TAC adequately states the first two element of the claim. As noted above, he only disputes the third element.

As discussed above, "commercial sex act" is a defined term under the TVPA, and expressly includes any sex act "on account of which anything of value is given to or received by any person." 18 U.S.C. § 1591(e)(3).  Because the language is expansive and is part of a remedial statute, it should be liberally construed in favor of Plaintiff.  Noble, 335 F. Supp. 3d at 515 (citing Peyton v. Rowe, 391 U.S. 54, 65, (1968).  As set forth in the TAC, David was enticed with at least two "things of value" as part of Weinstein's scheme, through force and fraud, to engage in sex acts with her: i) the opportunity to have a private meeting with Weinstein, who then had enormous power and influence in the film industry, to discuss potential movie and television opportunities; and ii) a role in the Netflix television program Marco Polo, for which Weinstein served was an executive producer.  (TAC ¶¶ 23-39, 176, 178).  As alleged, such opportunities can be career-making and life-changing for an actor such as David (Id. ¶ 177), and thus have immense value.

Recognizing this reality, every court to have considered Weinstein's argument over the last year has held that career opportunities such as those described in the TAC constitute "things of value" for purposes of the "commercial sex act" element of TVPA.  See Geiss v. Weinstein Co. Holdings LLC, 17 Civ. 9554, 2019 WL 1746009, at *6 (S.D.N.Y. Apr. 18, 2019) (holding that the "TVPA extends to enticement of victims by means of fraudulent promises of career advancement, for the purpose of engaging them in consensual or, as alleged here, non-consensual sexual activity"); Canosa v. Ziff, 18 Civ. 4115, 2019 WL 498865, at *22 (S.D.N.Y. Jan. 28, 2019) (holding allegations that plaintiff "expected to and in fact received career advances in exchange for participating in coerced sexual activity with Harvey Weinstein . . . easily" satisfied "commercial sex act" requirement of TVPA); Huett v. Weinstein Co. LLC, 18 Civ. 06012, 2018 WL 6314159, at *3 (C.D. Cal. Nov. 5, 2018) (plaintiff sufficiently alleged that she received

something of value for purposes of TVPA claim based on allegations that she "felt compelled to comply with Harvey Weinstein's acts toward her because of the benefits she would receive from his power and influence, including without limitation, a role on" a television program); <u>Noble v. Weinstein</u>, 335 F. Supp. 3d 504, 521 (S.D.N.Y. 2018) (holding that plaintiff, an actress with similar allegations as David, sufficiently alleged participation in a "commercial sex act" because "for an aspiring actress, meeting a world-renowned film producer carries value, in and of itself.").[3]

    Admittedly unable to distinguish these cases, Weinstein argues that these courts were wrong or influenced by the "torrent of negative media coverage" against him, taking particular issue with Judge Sweet's decision in <u>Noble</u>. Def's Br. 8-11.  Unsurprisingly, Weinstein offers no explanation for how some of these same courts managed to surmount press accounts to dismiss other claims brought against him.  <u>See e.g.</u>, <u>Canosa</u>, 2019 WL 498865 (dismissing claims against Weinstein under the Racketeer Influenced and Corrupt Organizations Act and under various state common law theories; <u>Geiss</u>, 2019 WL 1746009 (same).[4]  Moreover, the approach Weinstein claims that these courts should have followed in evaluating the plaintiffs'

---

[3]    <u>Accord</u> <u>United States v. Raniere</u>, 18 Cr. 2041, 2019 WL 1903365, at *22 (E.D.N.Y. Apr. 29, 2019) (in criminal action under Section 1959, rejecting argument that "non-monetary items" do not qualify as "things of value" for purposes of demonstrating a "commercial sex act"); <u>United States v. Rivera</u>, 12 Cr. 121, 2012 WL 6589526, at *5 (M.D. Fla. Dec. 18, 2012) (holding that the term "anything of value" "encompasses more than just monetary gain," including "ordination as a prophet"), <u>aff'd</u>, 551 F. App'x 531 (11th Cir. 2014).

[4]    In addition to insinuating that multiple federal judges made decisions against him based on media coverage, Weinstein, without any factual basis, accuses Plaintiff of filing her TVPA claim to "draw further headlines and get her case in the public eye."  Def's Br. at 5.  In fact, neither Plaintiff nor her counsel made any public statement about the claim when it was filed. Moreover, given the number of TVPA claims that have been already been sustained against Weinstein, there would have been no reason to believe that this particular TVPA claim would have warranted public attention.

TVPA claims is unpersuasive.  In sum, Weinstein contends that a "commercial sex act" under the TVPA must be a transaction that is "economic in nature," Def's Br.  7 (citing <u>United States v. Campbell</u>, 111 F. Supp.3d 340, 345 (W.D.N.Y. 2015), and that "economics" refers only to "the production, distribution, and consumption of commodities."  Def's Br.  7 (quoting <u>Gonzales v. Raich</u>, 545 U.S. 1, 25 (2005)).  Applying this "analysis" to David's claim, Weinstein suggests that David's "hope" for a "beneficial financial relationship" with Weinstein is an insufficient economic exchange to support a commercial sex act under the TVPA.  Def's Br.  8.

As an initial matter, Weinstein's argument mischaracterizes Plaintiff's allegations.  As discussed, "the thing of value" offered by Weinstein was not "hope," but a role in a major television series, as well as private meeting with one of the most influential producers in the entertainment industry.  Weinstein has not – and cannot – assert that these things have no value, particularly to someone working in the film business.

Contrary to Weinstein's argument, moreover, there is no basis to limit the phrase "anything of value" to an exchange of commodities or money, and not a single court has adopted such a construction of the TVPA.  In <u>Campbell</u>, 111 F. Supp.3d 340, the court held that § 1591(a) was a valid exercise of Congress's power under the commerce clause.  <u>Id.</u> at 342.  As part of that analysis, the court considered whether § 1591(a) regulates activity that has a substantial effect on interstate commerce and noted that "commercial sex acts are economic in nature."  <u>Id.</u> at 345 (citation omitted).  However, the court in <u>Campbell</u> did not suggest, no less hold, that "anything of value," in § 1591(e)(3), must be limited to transactions involving the sale or exchange of a commodity.  <u>See</u> <u>Raniere</u>, 2019 WL 1903365, at *22 (E.D.N.Y. Apr. 29, 2019) (distinguishing Campbell and other commerce clause cases "from the instant commercial sex act analysis").

Even more removed from the issue before the Court is <u>United States v. Reed</u>, 2017 WL 3208458, *10 (D.D.C. July 27, 2017), also cited by Weinstein, which applied a commerce clause analysis to the constitutionality of 18 U.S.C. § 2423(c), which prohibits the illicit sexual contact with minors in a foreign country. While the court in <u>Reed</u> recognized that the prohibition on the "commodity" of having illicit sex with children constituted a regulation of economic activity, the court did not at all address the definition of "commercial sex act" in § 1591(e)(3). Nothing in the <u>Reed</u> opinion suggests that the court would adopt the narrow construction of "commercial sex act" advanced by Weinstein here.

Equally unavailing is Weinstein's assertion that because Plaintiff was never actually cast in Marco Polo or any other Weinstein production, she did not receive anything of value and thus cannot allege a commercial sex act under the TVPA.  Def's Br.  7, 10.  Even if there had been no discussion about a specific role, as alleged in the TAC, David still received the opportunity to meet with Weinstein and discuss her career, potential film and television roles, and voiceover work, all of which had value to her.  TAC ¶¶ 23-30.  Furthermore, on the occasion that Weinstein raped Plaintiff, Weinstein enticed her to meet with him by saying that they should celebrate her role in Marco Polo, which David reasonably understood meant that she would, in fact, be cast in the series.  Id. ¶ 33.  This commitment had enormous value to David at the time it was made and constitutes "something of value" for purposes of the commercial sex act element of her TVPA claim.  <u>Noble</u>, 335 F. Supp. 3d at 521 ("Even if Plaintiff did not in fact receive a role in exchange for the sex act, but rather only received a promise of a role, such a promise would still have held value to Plaintiff at the time."). Although David, after Weinstein raped her, refused to talk to him further and was not ultimately cast in Marco Polo, TAC ¶¶ 38-39, it does not follow that Weinstein's assault was a not a commercial sex act at the time it occurred.

14

Weinstein's failure to follow through on his commitment to give David a role in Marco Polo does not absolve him of TVPA liability, but rather supports that he used fraud (as well as force) to cause David to participate in a commercial sex act pursuant to Section 1591(a).

Finally, the TAC also plausibly alleges that David received things of value "on account" of her participation in a sex act.  Indeed, as discussed above, the gravamen of David's TVPA claim is that Weinstein provided her with the opportunity to meet with him and a commitment to cast her in Marco Polo so that she would meet with him and he could force her to submit to unconsented sexual conduct, including rape.  This alleged quid pro quo is readily distinguishable from Kolbek v. Twenty First Century Holiness Tabernacle Church, Inc., 10-Civ-4124, 2013 WL 6816174, * 16 (W.D. Ark. Dec. 24, 2013), where the plaintiffs, on a motion for summary judgment, failed to present evidence that the living expenses that they received from defendant was at all connected to the sexual abuse that they experienced.  See Canosa, 2019 WL 498865, at *24 (distinguishing Kolbek for similar reason on motion to dismiss made by the Weinstein Companies); Raniere, 2019 WL 1903365, at *23 (E.D.N.Y. Apr. 29, 2019) (declining to dismiss criminal charges based on Kolbek and noting that whether alleged victims received "benefits on account of the alleged sex acts—is a factual question not appropriate for resolution on a pre-trial motion to dismiss").

For these reasons, David has plausibly alleged that she was forced to participate in a commercial sex act with the meaning of 18 U.S.C. § 1591(e)(3).

15

## CONCLUSION

For the reasons stated above, Defendant Harvey Weinstein's motion to dismiss Plaintiff's

claim under the TVPA should be denied.

Dated: July 22, 2019
          New York, New York

**WIGDOR LLP**

By: _____
          Douglas H. Wigdor
          Bryan L. Arbeit

          85 Fifth Avenue
          New York, New York 10003
          Telephone: (212) 257-6800
          Facsimile: (212) 653-1660
          dwigdor@wigdorlaw.com
          barbeit@wigdorlaw.com

**THE LAW OFFICE OF KEVIN MINTZER, P.C.**

          Kevin Mintzer
          1350 Broadway, Suite 1400
          New York, New York 10018
          Telephone: (646) 843-8180
          km@mintzerfirm.com

          *Attorneys for Plaintiff Wedil David*