UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

USDC-SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC#:
DATE FILED: 12/19/2019

---

WEDIL DAVID,

                Plaintiff,

       v.

THE WEINSTEIN COMPANY LLC, THE
WEINSTEIN COMPANY HOLDINGS
LLC, HARVEY WEINSTEIN, and
ROBERT WEINSTEIN,

                Defendants.

---

18-cv-5414 (RA)

OPINION & ORDER

RONNIE ABRAMS, United States District Judge:

Plaintiff Wedil David filed this action against Defendants Harvey Weinstein, Robert

Weinstein, The Weinstein Company LLC, and The Weinstein Company Holdings LLC,[1] asserting

claims related to two alleged incidents of sexual assault by Harvey Weinstein. Defendant Harvey

Weinstein moved to dismiss the Fifth Cause of Action (Sex Trafficking) for failure to state a claim

under Federal Rule of Civil Procedure 12(b)(6). Defendant Robert Weinstein moved to dismiss

the Sixth Cause of Action (Negligence)—the only claim asserted against him in Plaintiff's Third

Amended Complaint—for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6).

For the reasons set forth below, Harvey Weinstein's motion is denied, but Robert Weinstein's

motion is granted. Plaintiff may proceed with the following causes of action: sexual battery,

battery, assault, and sex trafficking against both Harvey Weinstein and the Companies; gender

violence against Harvey Weinstein; and negligence and negligent retention or supervision against

---

[1] The Weinstein Company LLC and The Weinstein Company Holdings LLC are collectively referred to as the
"Companies."

the Companies.

## BACKGROUND

The facts of this case have been detailed in the Court's prior opinion granting the motions to dismiss the claims against nine former directors of the Companies (the "Director Defendants"). *See David v. The Weinstein Company LLC*, No. 18-cv-5414 (RA), 2019 WL 1864073 (S.D.N.Y. Apr. 24, 2019). The Court therefore includes only those facts necessary to resolve the instant motions. These facts are drawn from Plaintiff's Third Amended Complaint, filed on June 6, 2019, and are assumed to be true for the purpose of the pending motions to dismiss. *See Stadnick v. Vivint Solar, Inc.*, 861 F.3d 31, 35 (2d Cir. 2017).

**I.     The Alleged Sexual Assaults**

Plaintiff alleges that she first met Harvey Weinstein ("HW") at a party hosted by the Companies in late 2011. TAC ¶ 24. Upon learning that she was an actress, Weinstein allegedly offered to help Plaintiff with her acting career. *Id.* ¶ 25. Plaintiff states that, over the next few years, HW invited her to attend award show parties hosted by the Companies, and that the two communicated every few months. *Id.* ¶ 26.

Plaintiff alleges that, in late 2015, she met HW at the Montage Hotel in Beverly Hills, California to discuss a possible role on a television show called "Marco Polo," on which both HW and his brother, Robert Weinstein ("RW"), served as executive producers. *Id.* ¶¶ 28–29. HW allegedly told Plaintiff that he "had another movie role that he would cast her in," and that he also wanted her to do some "voiceover work" for him because her voice was "soft and sexy." *Id.* ¶ 30. According to Plaintiff, at some point during this meeting in his hotel room, HW suddenly asked if he could masturbate in front of her. *Id.* ¶ 31. Although Plaintiff refused his request, HW allegedly grabbed her wrist with one hand, and masturbated "in front of her until completion" with the other.

*Id.* ¶ 32.

In early spring 2016, HW allegedly contacted Plaintiff to meet her once again at the Montage Hotel, in order to celebrate what he claimed would be her upcoming role in Marco Polo, "giving her the impression that she had been chosen for the part." *Id.* ¶ 33. Since Plaintiff had already been in contact with the Companies' employees about a role on Marco Polo, including speaking with a producer for Marco Polo, she agreed and met Weinstein in his hotel room. *Id.* ¶ 34. Plaintiff alleges that, at some point during this meeting, HW excused himself and returned wearing a bathrobe. *Id.* ¶ 36. According to Plaintiff, HW then "grabbed her" and "pulled her into the bedroom." *Id.* Although Plaintiff told HW that she "did not want to do anything sexual with him," he allegedly threw her on the bed, pulled down her jeans, and started to perform oral sex on her. *Id.* ¶ 37. Plaintiff alleges that HW then "used his massive weight and strength" to hold her down and force "his penis inside of her vagina without a condom." *Id.* After HW withdrew, he allegedly grabbed Plaintiff's wrist with one hand, and, as before, masturbated with the other. *Id.* Plaintiff states that she was eventually able to break free from his grasp and flee the suite. *Id.*

According to Plaintiff, HW subsequently contacted her, acted "as if nothing had happened" between them, and told her that he was coming to Los Angeles. *Id.* ¶ 38. In response, Plaintiff asserts that she "swore at him and hung up the phone." *Id.*

Plaintiff states that she neither received a job offer for "Marco Polo" nor for any of the other potential acting roles that HW had discussed with her. *Id.* ¶ 39.

Plaintiff also alleges that, for decades, HW had engaged in a "pattern and practice of sexually harassing" female employees, applicants, and "actresses seeking professional opportunities from him." *Id.* ¶ 88. According to Plaintiff, the Companies were also aware that HW engaged in a pattern of "using his power and the promise of procuring jobs to coerce and force

actresses to engage in sexual acts with him." *Id.* ¶ 94.

## II.    Additional Allegations About Robert Weinstein

Plaintiff alleges that, during their time together at Miramax, RW knew that HW "engaged in a pattern of sexual misconduct and he helped HW cover it up." *Id.* ¶ 43. Specifically, Plaintiff alleges that while at Miramax, a young woman left the company abruptly after an "encounter with HW," and that the woman later received a settlement. *Id.* ¶ 45. Plaintiff asserts that "RW personally knew the circumstances that caused this young woman's abrupt departure" because his assistant handed him a letter from the woman's lawyer, which stated "Your brother is a pig." *Id.* ¶ 46.

Plaintiff next alleges that, in 1998, RW personally paid £250,000 to settle claims that asserted HW had "sexually assaulted and attempted to rape a female employee." *Id.* ¶ 47. According to Plaintiff, that settlement agreement also listed RW as one of the released parties, and stated that only RW or HW could consent to the release of confidential information covered by the agreement. *Id.* ¶ 48. Plaintiff asserts that RW had both "personal and financial motives to help conceal HW's sexual misconduct." *Id.* ¶ 50.

Plaintiff asserts that, although RW knew about HW's sexual misconduct and helped to conceal it, RW nonetheless made public statements about HW's "'good' behavior." *Id.* ¶ 57. According to Plaintiff, RW's statements "maintained the public perception that HW was a 'kind' and 'gentle' person." *Id.* ¶ 59.

Despite knowing about HW's sexual misconduct, Plaintiff alleges, RW nonetheless decided to leave Miramax with HW in 2005 to start the Companies. *Id.* ¶ 60. Plaintiff further states that, notwithstanding his purported knowledge that HW still engaged in "similar sexualized and abusive conduct," RW effectively gave HW "free reign to run his portion of the business." *Id.* ¶ 62.

Plaintiff further alleges that RW knew HW "posed a risk to the female employees and actresses" that HW encountered in connection with the business. *Id.* ¶ 64. RW, however, allegedly "did nothing to warn or otherwise protect" those female employees and actresses. *Id.* ¶ 67. Rather, Plaintiff claims, RW permitted HW to "misuse the Companies' funds and resources to engage in his sexual misconduct." *Id.* ¶ 68.

According to Plaintiff, RW also knew that his brother was "doing nothing" to address his "sexualized and abusive behavior." *Id.* ¶ 71. Plaintiff asserts that HW's behavior "got so bad" that RW and HW stopped interacting. *Id.* ¶ 73. RW allegedly moved to Los Angeles to run the Companies' office there, and so that he could "further distance himself from HW and not be forced to take action to stop his sexual misconduct." *Id.* ¶ 75. Plaintiff again alleges that, throughout this time, RW "did nothing to stop HW or warn other female employees and actresses about the consequences of being around HW." *Id.* ¶ 73. Plaintiff states that although RW "distanced and protected *himself* from HW," he still did not warn or protect anyone else. *Id.* ¶ 76.

Plaintiff asserts that, rather than taking any action, RW "continued to back HW" professionally, including by re-signing his employment agreement in 2015. *Id.* ¶ 78–79. According to Plaintiff, RW had a financial incentive "not to warn" the Companies' Board of Directors about HW's sexual misconduct or about RW's own "prior acts" to conceal the misconduct. *Id.* ¶ 84.

## PROCEDURAL HISTORY

The Court assumes the parties' familiarity with the procedural history of this case. Events between November 14, 2017, when Plaintiff filed her initial complaint in California state court, and April 24, 2019, when this Court dismissed Plaintiff's claims against the Director Defendants, were summarized in the Court's prior opinion. *See David*, 2019 WL 1864073, at *3–4. The Court

now details the procedural history subsequent to its April 24, 2019 opinion.

On May 17, 2019, Plaintiff filed a Third Amended Complaint. *See* Dkt. 147. Plaintiff's Third Amended Complaint pleaded an additional cause of action against HW and the Companies —Sex Trafficking under the Trafficking Victims Protection Act (the "TVPA"), 18 U.S.C. § 1591 —as well as additional allegations purporting to demonstrate RW's negligence. *See* Dkt. 148.

On June 6, 2019, Plaintiff re-filed her Third Amended Complaint ("TAC"), naming as Defendants only The Weinstein Company LLC, The Weinstein Company Holdings LLC, HW, and RW. *See* Dkt. 161.

On June 21, 2019, HW moved to dismiss Plaintiff's Fifth Cause of Action (Sex Trafficking under the TVPA). *See* Dkt. 164.[2] On that same day, RW separately moved to dismiss Plaintiff's Sixth Cause of Action (Negligence), the only cause of action still asserted against him. *See* Dkt. 167. Plaintiff filed oppositions to both motions on July 22, 2019. *See* Dkts. 169 and 170. HW and RW filed replies on August 19, 2019. *See* Dkts. 175 and 176, respectively.[3]

On September 16, 2019, the Court stayed discovery as to RW pending the resolution of his motion to dismiss, and, as to HW and the Companies, referred the case to Magistrate Judge Lehrburger for general pretrial purposes (after which it was reassigned to Magistrate Judge Fox). *See* Dkt. 182.

On November 6, 2019, the Court held argument on both HW's and RW's motions to dismiss. *See* Dkt. 196. For the reasons discussed below, the Court now denies HW's motion, but

---

[2] HW has not moved to dismiss any of Plaintiff's other claims against him: sexual battery in violation of Cal. Civ. Code § 1708.5 (First Cause of Action); gender violence in violation of Cal. Civ. Code § 52.4 (Second Cause of Action); battery (Third Cause of Action); and assault (Fourth Cause of Action).

[3] On August 12, 2019, the Companies filed their Answer to the TAC. *See* Dkt. 174. The Companies have not moved to dismiss any of Plaintiff's claims.

grants RW's motion.

**STANDARD OF REVIEW**

To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), a complaint must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of entitlement to relief.'" *Id.* (quoting *Twombly*, 550 U.S. at 557). On a Rule 12(b)(6) motion, the question is "not whether [the plaintiff] will ultimately prevail," but "whether [her] complaint [is] sufficient to cross the federal court's threshold." *Skinner v. Switzer*, 562 U.S. 521, 529–30 (2011) (citation omitted). In answering this question, the Court must "accept[] all factual allegations as true, but 'giv[e] no effect to legal conclusions couched as factual allegations.'" *Stadnick*, 861 F.3d at 35 (quoting *Starr v. Sony BMG Music Entm't*, 592 F.3d 314, 321 (2d Cir. 2010)).

**DISCUSSION**

**I.    Defendant Harvey Weinstein's Motion to Dismiss the Fifth Cause of Action**

HW argues that Plaintiff fails to state a claim for sex trafficking under the Trafficking Victims Protection Act (the "TVPA"), 18 U.S.C. § 1591, because she fails to plausibly allege a "commercial sex act," a required element of the claim. HW contends that because the TAC does not allege that Plaintiff received "anything of value, such as money, property, or any specific career advancement" in connection with the two alleged sexual assaults, *see* HW Mot., Dkt. 165, at 3, Plaintiff's sex trafficking claim must fail. The Court disagrees.

7

Section 1591 provides that "Whoever knowingly . . . in or affecting interstate or foreign commerce, . . . recruits, entices, harbors, transports, provides, obtains, advertises, maintains, patronizes, or solicits by any means a person . . . knowing, or . . . in reckless disregard of the fact, that means of force, threats of force, fraud, . . . or any combination of such means will be used to cause the person to engage in a commercial sex act, . . . shall be punished as provided in subsection (b)." 18 U.S.C. § 1591(a). The term "commercial sex act" is defined as "any sex act, on account of which anything of value is given to or received by any person." 18 U.S.C. § 1591(e)(3).

Thus, to state a claim under Section 1591, "as applied here, Plaintiff must adequately plead that [HW] knowingly and in interstate or foreign commerce: (1) recruited, enticed, harbored, transported, provided, obtained, or maintained by any means a person; (2) 'knowing, or in reckless disregard of the fact, that means of force, threats of force, fraud . . . or any combination of such means will be used'; (3) 'to cause the person to engage in a commercial sex act.'" *Noble v. Weinstein*, 335 F. Supp. 3d 504, 515 (S.D.N.Y. 2018) (quoting 18 U.S.C. § 1591)).

Numerous judges in this district have denied motions to dismiss similar TVPA claims brought against HW. *See Geiss v. The Weinstein Co. Holdings LLC*, 383 F. Supp. 3d 156, 163, 168 (S.D.N.Y. 2019) (denying HW's motion to dismiss the sex trafficking claim under the TVPA where HW's behavior "followed a consistent pattern," in which HW "set up meetings with women under the guise of assisting them with their careers, isolated them after they had arrived for the meetings, and assaulted, battered, or attempted to assault them"); *Canosa v. Ziff*, No. 18 Civ. 4115 (PAE), 2019 WL 498865, at *22 (S.D.N.Y. Jan. 28, 2019) (rejecting the argument that "the TVPA was not intended to apply in contexts such as those pled by Canosa," and holding that the allegations in plaintiff's amended complaint stated a claim for sex trafficking under the TVPA as against HW); *Noble*, 335 F. Supp. 3d at 521 (denying HW's motion to dismiss the sex trafficking

claim and holding that plaintiff sufficiently alleged participation in a "commercial sex act" because "[f]or an aspiring actress, meeting a world-renowned film producer carries value, in and of itself"). This Court finds persuasive the reasoning employed and the conclusions rendered in these cases. *See also Ardolf v. Weber*, No. 18 Civ. 12112 (GBD), 2019 WL 3759374, at *2–3, *7 (S.D.N.Y. July 25, 2019) (denying photographer's motion to dismiss sex trafficking claim brought under the TVPA by former male models where plaintiffs alleged sexual assault in connection with photographer's "offer[] [of] valuable career advancement, including future modeling jobs").

### A. HW's Conduct Falls Within the Plain Language of the TVPA

In a case alleging a statutory violation, a court "begin[s] with the text of the statute to determine whether the language at issue has a plain and unambiguous meaning." *Louis Vuitton Malletier S.A. v. LY USA, Inc.*, 676 F.3d 83, 108 (2d Cir. 2012) (citing *Robinson v. Shell Oil Co.*, 519 U.S. 337, 340 (1997)). If a statute's language does in fact have a plain and unambiguous meaning, the inquiry ends there. *See BedRoc Ltd., LLC v. United States*, 541 U.S. 176, 183 (2004) ("[O]ur inquiry begins with the statutory text, and ends there as well if the text is unambiguous.") (citations omitted). The TVPA's language, while broad, is plain and unambiguous. The statute provides that any person who "knowingly" "entices," among other things, another person "by any means," knowing that "force, threats of force, fraud, . . . or any combination" thereof "will be used to cause" that person "to engage in a commercial sex act," is liable for sex trafficking under the TVPA. *See* 18 U.S.C. § 1591(a). As discussed below, the phrase "commercial sex act" is expressly defined in the statute, and there is nothing ambiguous about the remaining language of the provision.

Numerous courts have thus found that the TVPA covers allegations of coercive sexual assault where the defendant uses force and/or fraud to entice the plaintiff to engage in a

"commercial sex act," even if the defendant has not "trafficked" the plaintiff within the ordinary or traditional meaning of that word. *See Ardolf*, 2019 WL 3759374, at *3 ("Even though this law has been traditionally used to prosecute the types of sex trafficking that Defendant describes, [i.e., 'the illicit sex trade and human trafficking for commercial gain,'] that does not mean that it only applies in those circumstances."); *Geiss*, 383 F. Supp. 3d at 168 ("[T]he TVPA extends to enticement of victims by means of fraudulent promises of career advancement, for the purpose of engaging them in consensual or, as alleged here, non-consensual sexual activity."); *Canosa*, 2019 WL 498865, at *23 ("[Defendants'] attempt to cabin the TVPA to reach only caricatures of child slavery, and to exclude corporate-supported conduct, is wholly unpersuasive. The text of the TVPA does not provide any charter for this self-serving distinction."); *Noble*, 335 F. Supp. 3d at 516 (rejecting the argument that "the application of Section 1591 should be limited to 'the type of criminality for which the Government has historically prosecuted under Section 1591, such as child prostitution, torture, and child pornography,'" and noting that "other courts have applied Section 1591 to defendants who have lured women, under false pretenses and with lucrative promises, for sexual purposes") (citations omitted); *see also Huett v. The Weinstein Co. LLC*, No. 18-cv-06012-SVW-MRW, 2018 WL 6314159, at *1 (C.D. Cal. Nov. 5, 2018) ("[N]otwithstanding Defendant's argument regarding legislative intent, there are reasons to believe that Sections 1591 and 1595 should be interpreted broadly.").

The Court disagrees with HW's contention that applying the TVPA to Plaintiff's sex trafficking claim would be "an utter perversion of the legislative intent behind the statute," HW Mot. at 5, because, as HW claims, the TVPA was not intended to cover allegations of sexual assault "related to an interview or meeting with a superior," HW Reply, Dkt. 175, at 7. As an initial matter, the Court need not look to the legislative history where the statute's language is plain and

unambiguous, as here. *See BedRoc Ltd.*, 541 U.S. at 183; *Lawrence + Memorial Hosp. v. Burwell*, 812 F.3d 257, 266 (2d Cir. 2016). Moreover, HW's argument that the TVPA is only appropriate in cases of "slavery, involuntary servitude, or human trafficking," such as those that involve "the sale of women and minors, drugging and kidnapping, smuggling women and minors, and forced prostitution," appears to be based on one piece of legislative history—a House of Representatives Committee Report on the original version of the TVPA. *See* HW Mot. at 5. HW's narrow interpretation of Section 1591 ignores both basic canons of statutory interpretation and the prevailing case law. The Court's conclusion, moreover, is reinforced by the fact that "Section 1595 is a remedial provision that permits civil actions for damages under Section 1591," and the Supreme Court "has recognized a 'canon of construction' that remedial statutes should be liberally construed." *Huett*, 2018 WL 6314159, at *1 (quoting *Peyton v. Rowe*, 391 U.S. 54, 65 (1968)).

In short, while this case might not be an "archetypal sex trafficking action," *see Noble*, 335 F. Supp. 3d at 515, the Court nonetheless finds the TVPA's language broad, the other judges' analyses in similar cases against HW compelling, and HW's arguments unavailing. The Court therefore concludes that the TVPA can be appropriately applied to this case.[4]

## B. The TAC Adequately Pleads that HW "Enticed" Plaintiff

It appears undisputed that Plaintiff has adequately alleged that HW "enticed" her. For the purposes of a Section 1591 claim, courts have interpreted the word "entice" based on its ordinary

---

[4] The Court is also not convinced that application of the TVPA here would cause a "dangerous domino effect" in which "this Circuit will be faced with a tidal wave of cases involving trafficking claims arising from any job interview or meeting in which there is a disparate level of power or fame." HW Mot. at 4, 8–11. HW offers no support for his dramatic assertion, other than to say that *Noble* and the subsequent cases were decided in error, *see id.* at 8–10, and/or were "[e]mboldened by the torrent of negative media coverage [of HW] over the past year and a half," *see id.* at 11. However, a sex trafficking claim will not arise from "any job interview or meeting in which there is a disparate level of power or fame," as HW suggests. Importantly, the other elements of Section 1591 serve as a natural limiting principle, as—in HW's hypothetical—the superior must have first *enticed* the victim, using some combination of fraud and/or force, and the superior must then have caused the victim to engage in a sex act.

meaning, which is "'to attract artfully or adroitly or by arousing hope or desire,' and '[to] attract or tempt by offering pleasure or advantage.'" *Noble*, 335 F. Supp. 3d at 517 (citations omitted). The TAC alleges that Plaintiff met with HW in late 2015 "to discuss a prospective acting job" on Marco Polo, and that during that meeting, HW also told Plaintiff that he "wanted her to do some voiceover work for him because her voice was 'soft and sexy,'" and that he "had another movie role that he would cast her in." TAC ¶¶ 28, 30. In early spring 2016, HW allegedly organized a second meeting with Plaintiff "to celebrate her upcoming role in Marco Polo, giving her the impression that she had been chosen for the part." *Id.* ¶ 33. HW's "empty promises of a film role" in both situations were "more than enough to arouse 'hope and desire' in [Plaintiff], an aspiring actress," thereby sufficiently "enticing" her. *See Noble*, 335 F. Supp. 3d at 517; *see also Ardolf*, 2019 WL 3759374, at *3 ("[T]he use of the term 'entice' in the TVPA means that the perpetrator attracts the victim by offering something that arouses hope or desire.").

## C. The TAC Adequately Pleads that HW Knew "Means of Force [and] Fraud" Would Be Used

Plaintiff has also sufficiently alleged that HW knew he would use fraud and force. For the purposes of a Section 1591 claim, courts have found that the requirement of "knowledge" is satisfied if the complaint plausibly alleges "a *modus operandi*, such that [the defendant] knew that he had a pattern of using fraud or force to cause commercial sex acts with victims." *Ardolf*, 2019 WL 3759374, at *4; *see also Noble*, 335 F. Supp. 3d at 517–18 ("The plain language of Section 1591(a) requires Plaintiff to plausibly allege knowledge, or a *modus operandi*, associated with [the] 'enticement,' that Defendant enticed Plaintiff with knowledge that means of force or fraud would be used to cause a commercial sex act to take place.") (citing *United States v. Todd*, 627 F.3d 329, 333–34 (9th Cir. 2010)). In other words, Plaintiff must allege that HW had an awareness or understanding that "if things go as he has planned, force, fraud or coercion will be employed to

cause his victim to engage in a commercial sex transaction." *Todd*, 627 F.3d at 334; *see also Noble*, 335 F. Supp. 3d at 518 (explaining that plaintiff is required to allege that defendant had "awareness, at the initial recruitment or enticement stage, that certain prohibited means will be employed to achieve a perverse end goal: a commercial sex act").

The TAC contains a "pattern of behavior," or *modus operandi*, that "plausibly alleges a knowledge and understanding that . . . [HW] would use fraudulent means to entice [Plaintiff] to engage in a sex act with him." *Noble*, 335 F. Supp. 3d at 518; *see* TAC ¶¶ 23–39. In particular, Plaintiff alleges that, "[f]or decades," HW had a "pattern and practice of sexually harassing female employees and applicants as well as actresses seeking professional opportunities from him." TAC ¶ 88. According to Plaintiff, HW "us[ed] his power and the promise of procuring jobs to coerce and force actresses to engage in sexual acts with him." *Id.* ¶ 94. Plaintiff's allegations that HW "lure[d]" her to a hotel with "the promise of a role" in one of his productions, *id.* ¶ 1, must be viewed in combination with the allegations that HW had engaged in a pattern of doing the same with other women over decades. This leads to the plausible inference that HW knew that force and fraud would be used to cause Plaintiff to engage in a commercial sex act.

Though Plaintiff need not allege both "fraud" and "force," here, the TAC adequately pleads that HW knew both means would be used. Plaintiff alleges that HW used fraud since, according to the TAC, he made "fraudulent promises and offers of career success" in order to lure Plaintiff to his hotel room on two occasions. *See Ardolf*, 2019 WL 3759374, at *4. Specifically, Plaintiff alleges that the first meeting was set up "to discuss a prospective acting job on a television show called 'Marco Polo,'" and that during the meeting, HW also made statements indicating that he wanted to hire her for "some voiceover work" and "another movie role." TAC ¶¶ 28, 30. As to the second meeting, Plaintiff asserts that HW asked to meet with her "to celebrate her upcoming

role in Marco Polo." *Id.* ¶ 33. As Plaintiff "never received a job offer for the Marco Polo project," nor for any "other projects that HW had discussed with her," *id.* ¶ 39, the allegations in the TAC "go beyond mere non-performance," and "evidence conscious behavior and fraudulent intent." *Noble*, 335 F. Supp. 3d at 518. Indeed, HW's failure to perform on these alleged promises suggests that he *knew* "his promises had no factual basis" when he enticed Plaintiff to meet with him. *Id.*

The TAC also contains multiple allegations that HW used force. *See* TAC ¶ 32 ("HW proceeded to grip her wrist with one hand while using the other to masturbate in front of her until completion."); *id.* ¶ 36 ("HW grabbed her and pulled her into the bedroom."); *id.* ¶ 37 ("HW then used his massive weight and strength to force himself on her, pushing his penis inside of her vagina without a condom."). As Section 1591 "refers to the noun 'force,' not to the verb 'to force,'" *see Ardolf*, 2019 WL 3759374, at *5, these allegations are sufficient to show that HW used force to cause Plaintiff to engage in the alleged sexual assaults.

### D. The TAC Adequately Pleads a "Commercial Sex Act"

Lastly, Plaintiff has sufficiently alleged that HW's use of fraud and force caused her to engage in a commercial sex act. As an initial matter, Plaintiff has adequately pleaded a "sex act." *See, e.g.*, TAC ¶¶ 32, 37. The issue before the Court is thus whether Plaintiff has adequately pleaded a "*commercial* sex act" under the TVPA.

"'Commercial sex act' is defined in Section 1591(e)(3) as '*any* sex act, on account of which *anything* of value is given to or received by *any* person." *Noble*, 335 F. Supp. 3d at 520 (quoting 18 U.S.C. § 1591(e)(3)) (emphasis in *Noble*). "Congress's use of expansive language in defining commercial sex act—using such terms as 'any sex act,' 'anything of value,' 'given to or received by any person'—requires a liberal reading." *Id.* at 521; *see also id.* at 516 ("Where, as here, a broad statute has a plain and unambiguous meaning, it ought to be interpreted broadly.") (citing

*BedRoc Ltd.*, 541 U.S. at 183). In fact, the sex act itself need not occur to state a cause of action under the TVPA. *See United States v. Alvarez*, 601 F. App'x 16, 18 (2d Cir. 2015) ("The [TVPA] criminalizes certain means when they are 'used to cause' an act, and thus is concerned with the means and not with the result."). A plaintiff's sex trafficking claim thus survives if she pleads that the defendant enticed her while knowing that he would cause her to engage in a commercial sex act, regardless of whether that act ultimately occurs. *See United States v. Corley*, 679 F. App'x 1, 7 (2d Cir. 2017) ("[T]he plain meaning of the statute . . . requires only that the defendant 'know' that the victim 'will be caused' to engage in a commercial sex act; the statute does not require that an actual commercial sex act have occurred."); *see also United States v. Bazar*, 747 F. App'x 454, 456 (9th Cir. 2018) ("[A] trafficker can be convicted under section 1591 even if his victim did not perform a single commercial sex act.") (citation omitted); *United States v. Williams*, 666 F. App'x 186, 197 n.6 (3d Cir. 2016) ("[Section] 1591 does not require that there be a direct temporal nexus between the threats, force, fraud, or coercion and the commercial sex act although the closer the coercive conduct is to the [sex acts], the more likely the causation element of the offense will be satisfied.").

When accepting all factual allegations as true and construing reasonable inferences in Plaintiff's favor, the Court finds that the TAC plausibly alleges that Plaintiff received a thing "of value" in exchange for the sex acts that took place. Plaintiff, an aspiring actress, received meetings—private meetings—with one of the most influential producers in her industry, as well as opportunities for potential movie and television roles based on her contact with him. *See* TAC ¶¶ 23–39. The Court agrees with the other judges who have considered this issue that these meetings, as well as the promises of professional opportunities and success attendant to these meetings, are things of value for the purposes of a TVPA claim. *See Noble*, 335 F. Supp. 3d at

521 ("For an aspiring actress, meeting a world-renowned film producer carries value, in and of itself. The opportunity, moreover, for the actress to sit down with that producer in a private meeting to . . . discuss a promised film role carries value that is career-making and life-changing."); *see also Ardolf*, 2019 WL 3759374, at \*7 (holding that "Defendant's alleged fondling of Plaintiffs' genitals was commercial in nature because he offered them valuable career advancement, including future modeling jobs, to allow it to happen") (citations omitted); *Geiss*, 383 F. Supp. 3d at 168 (holding that "the TVPA extends to enticement of victims by means of fraudulent promises of career advancement, for the purpose of engaging them in consensual or . . . non-consensual sexual activity"); *Canosa*, 2019 WL 498865, at \*22 n.26 (holding that plaintiff adequately pleaded a "commercial sex act" based on her "reasonable expectation of receiving [something of value] in the future, based on [HW's] repeated representations that she would") (citation omitted).

Plaintiff alleges that she first met with HW in late 2015 "to discuss a prospective acting job" on Marco Polo and other potential roles. TAC ¶¶ 28, 30. Following that meeting—at which HW forcibly held Plaintiff's wrist while masturbating in front of her—she had "several phone calls and emails with the Companies' employees about a role on Marco Polo," and even spoke to a producer for Marco Polo. *Id.* ¶ 34. At some point also following that first meeting, HW allegedly contacted Plaintiff again to meet with him to "celebrate her upcoming role in Marco Polo, giving her the impression that she had been chosen for the part." *Id.* ¶ 33. Thus, with respect to the first meeting and the attendant sex act, at the very least, Plaintiff has alleged that she received "phone calls and emails" about Marco Polo, if not an actual role on Marco Polo—all of which constitute "things of value" for the purposes of her sex trafficking claim.

When Plaintiff then returned to HW's hotel room a second time in early spring 2016, she did so because HW had contacted her purportedly "to celebrate her upcoming role in Marco Polo."

*Id.* Although she had previously discussed this role with employees at the Companies, she had not yet been officially cast in the role. *Id.* ¶ 34. HW's suggestion that he wanted to celebrate her upcoming role in Marco Polo led her to believe that she had gotten the part. *Id.* ¶ 33. It is reasonable to assume that Plaintiff expected to receive something of value—at a minimum, the role in Marco Polo—in return for meeting with HW a second time. At that second meeting, HW "force[d] himself on her, pushing his penis inside of her vagina." *Id.* ¶ 37. Plaintiff ultimately broke free and left the hotel room, subsequently swearing at HW and hanging up on him when he "contacted [her] thereafter and acted as if nothing had happened." *Id.* ¶ 38. Although she never received the role on Marco Polo, Plaintiff nonetheless received a "thing of value" from this meeting and sexual encounter for purposes of the TVPA—not only the meeting, but also the promise of and opportunity for career advancement.

In evaluating a Section 1591 claim, it is also important to view the conduct through the perspective of the alleged perpetrator. The Court must determine whether HW "intended, or was aware, 'that the fraud and force *would cause* a [commercial] sex act to take place." *Ardolf*, 2019 WL 3759374, at *5 (quoting *Noble*, 335 F. Supp. 3d at 519). As to the fraud, "the question is whether [HW] made *material* misstatements that he knew a reasonable plaintiff would rely on." *Id.* at *6 (citation omitted). The allegations in the TAC support a finding that HW made material misrepresentations to Plaintiff, by suggesting that he had certain film and television roles in mind for her and by specifically representing that she had received the role in Marco Polo. *See* TAC ¶¶ 28, 30, 33. Moreover, HW knew that an "aspiring actress" in Plaintiff's position would reasonably rely on such statements. *See Ardolf*, 2019 WL 3759374, at *6 ("Defendant's promises of career advancement were undoubtedly material because he was very powerful and influential in the fashion industry, so it was perfectly reasonable for aspiring male models to rely on them.")

(citation omitted); *Noble*, 335 F. Supp. 3d at 519 (finding that, "[m]ade to an aspiring actress by a film producer and co-founder of a top film studio, the statements are clearly material, and induced reasonable reliance," particularly since "[t]he statements caused [the aspiring actress] to first go to [HW's] hotel room, and then to partially 'compl[y]' in the performance of a sex act").

The TAC also adequately pleads that HW knew he would use force to cause Plaintiff to engage in a sex act. Plaintiff's allegations that HW used physical force during both incidents, *see* TAC ¶¶ 32, 36–37, as well as her allegations that HW engaged in a "pattern of using his power and the promise of procuring jobs to . . . force actresses to engage in sexual acts with him," *id.* ¶ 94, inevitably leads to this conclusion.

Finally, contrary to HW's assertion that a "commercial sex act" must be "economic in nature," HW Mot. at 7, the TVPA contains no such requirement. Indeed, courts have routinely rejected this argument. *See, e.g., Noble*, 335 F. Supp. 3d at 515–16 (rejecting HW's argument that "the 'commercial sex act' element [was] absent because nothing of value was exchanged"); *United States v. Raniere*, 384 F. Supp. 3d 282, 318 (E.D.N.Y. 2010) ("Courts have consistently held that 'anything of value' encompasses more than simply monetary exchanges.").[5] Moreover, the fact

---

[5] The one case that HW cites as "particularly instructive" on this point is not so. *See* HW Mot. at 8. HW cites *Kolbeck v. Twenty First Century Holiness Tabernacle Church, Inc.*, No. 10-CV-4124, 2013 WL 6816174 (W.D. Ark. Dec. 24, 2013) for the proposition that the TVPA should not apply "in the absence of a clear exchange of value." HW Reply at 6; *see also* HW Mot. at 8. But in *Kolbeck*, whether plaintiffs alleged "a thing of value" was not at issue. Rather, the court rejected the sex trafficking claim because it found that there was no causal connection between the "thing of value" (the payment of living expenses) and the sex act. *See Kolbeck*, 2013 WL 6816174, at *16 ("Plaintiffs offer no evidence of a causal relationship between the sex acts and the payment of expenses" since they "have not offered any evidence showing that [their] living expenses were paid as some sort of *quid pro quo* for the sex acts that occurred with [Defendant]."). Here, the TAC alleges a connection between the meetings and potential for career advancement, on the one hand, and the sexual assaults, on the other, because Plaintiff expected to receive something of value in exchange on both occasions. In other words, the TAC plausibly alleges that Plaintiff received the "thing of value"— both the meetings and the promises of certain movie and television roles—as a *quid pro quo* for meeting with HW and being caused to engage in the sex acts. The other cases cited by HW are inapposite. In *United States v. Campbell*, 111 F. Supp. 3d 340 (W.D.N.Y. 2015), the court addressed whether Section 1591 was a valid exercise of Congress's Commerce Clause power, but did not define or limit "anything of value" to include only those transactions involving money. In *United States v. Reed*, No. 15-188 (APM), 2017 WL 3208458 (D.D.C. July 27, 2017), the court analyzed

that HW did not ultimately deliver on his promises to cast Plaintiff in Marco Polo, or any other television or movie roles, does not mean that Plaintiff was not given anything of value. To the contrary, "[e]ven if the prospect[s] of a film role . . . were not 'things of value' sufficient to satisfy [the] commercial aspect of the sex act definition, [Plaintiff's] reasonable expectation of receiving those things in the future, based on [HW's] repeated representations that she would, is sufficient." *Noble*, 335 F. Supp. 3d at 521; *see also Huett*, 2018 WL 6314159, at *3 ("Even if Plaintiff did not in fact receive a role in exchange for the sex act, but rather only received a promise of a role, such a promise would still have held value to Plaintiff at the time."). The TAC alleges such promises were made. *See, e.g.*, TAC ¶ 30 (HW told Plaintiff that he wanted her "to do some voiceover work for him" and that he "had another movie role that he would cast her in"). Further, even the mere "hope for a beneficial financial relationship," as HW concedes is alleged in the TAC, *see* HW Mot. at 8, would suffice.

Because the TAC adequately pleads that Plaintiff received something of value in exchange for the sex acts, and that HW knew he would use fraud and/or force to cause Plaintiff to engage in those sex acts, Plaintiff adequately pleads a commercial sex act, and thus a sex trafficking claim under the TVPA. HW's motion to dismiss the Fifth Cause of Action is therefore denied.

## II.     Defendant Robert Weinstein's Motion to Dismiss the Sixth Cause of Action

RW argues that Plaintiff fails to state a claim for negligence because the TAC fails to establish any legally cognizable duty of care that RW owed to Plaintiff. The Court agrees. Under either New York law or California law, Plaintiff fails to state a claim for negligence as to RW

---

the constitutionality of a different statute, 18 U.S.C. § 2423(c), and again did not limit "commercial sex act" as defined in Section 1591 in any way.

because the allegations in the TAC do not establish the threshold element of duty.[6]

## A. Standard of Negligence

"To establish a prima facie case of negligence under New York law, 'a plaintiff must demonstrate (1) a duty owed by the defendant to the plaintiff, (2) a breach thereof, and (3) injury proximately resulting therefrom.'" *Lerner v. Fleet Bank, N.A.*, 459 F.3d 273, 286 (2d Cir. 2006) (quoting *Solomon ex rel. Solomon v. City of New York*, 66 N.Y.2d 1026, 1027 (1985)). As the Court explained when granting the Director Defendants' motions to dismiss, "absent a special relationship, 'a defendant generally has no duty to control the conduct of third persons so as to prevent them from harming others, even where as a practical matter [the] defendant can exercise such control.'" *David*, 2019 WL 1864073, at *6 (quoting *Rabin v. Dow Jones & Co., Inc.*, No. 14-cv-4498 (JSR), 2014 WL 5017841, at *21 (S.D.N.Y. Sept. 23, 2014)). Furthermore, "[a]bsent a duty running directly to the injured person there can be no liability in damages, however careless the conduct or foreseeable the harm." *Id.* (quoting *532 Madison Ave. Gourmet Foods, Inc. v. Finlandia Ctr., Inc.*, 96 N.Y.2d 280, 289 (2001)).

Similarly, in order to state a claim for negligence under California law, "a plaintiff must establish four required elements: (1) duty; (2) breach; (3) causation; and (4) damages." *Fabian v. LeMahieu*, No. 19-CV-00054-YGR, 2019 WL 4918431, at *11 (N.D. Cal. Oct. 4, 2019) (quoting *Illeto v. Glock Inc.*, 349 F.3d 1191, 1203 (9th Cir. 2003)). "Generally, under California law, there is 'no duty to act to protect others from the conduct of third parties.'" *McConnell v. Lassen Cty.*,

---

[6] Both parties agree that the Court need not address the choice of law issue at this time. In any event, as the parties also agree, there is no material difference between the substantive negligence laws of New York and California for the purposes of RW's motion to dismiss. *See* RW Mot., Dkt. 168, at 7; Pl. Opp'n, Dkt. 170, at 8–9, 8 n.4. Plaintiff's negligence claim against RW fails regardless of which state's law governs.

No. Civ. S-05-0909 FCD DAD, 2007 WL 1412300, at *4 (E.D. Cal. May 14, 2007) (quoting *Margaret W. v. Kelley R.*, 139 Cal. App. 4th 141, 150 (Ct. App. 2006)); *see also Toomer v. United States*, 615 F.3d 1233, 1236 (9th Cir. 2010) ("The first element of any negligence claim is the existence of a duty. . . . Generally there is no obligation to protect others from the harmful conduct of third parties.") (citations omitted). "However, a defendant may owe an affirmative duty to protect another from the conduct of third parties if he or she has a 'special relationship' with the other person." *McConnell*, 2007 WL 1412300, at *4 (quoting *Delgado v. Trax Bar & Grill*, 36 Cal. 4th 224, 235 (2005)); *see also Regents of the Univ. of Cal. v. Superior Court*, 4 Cal. 5th 607, 619 (2018) ("A person who has not created a peril is not liable in tort merely for failure to take affirmative action to assist or protect another unless there is some relationship between them which gives rise to a duty to act.") (quoting *Williams v. California*, 34 Cal. 3d 18, 23 (1983)). Nonetheless, "[i]f there is no duty, there can be no liability, no matter how easily one may have been able to prevent injury to another." *Margaret W.*, 139 Cal. App. 4th at 150.

## B. The TAC Does Not Adequately Plead that RW Owed Plaintiff a Duty

Plaintiff concedes that RW did not owe her a duty of care based on any "special relationship."[7] *See, e.g.*, Pl. Opp'n, Dkt. 170, at 10. Instead, Plaintiff now argues that RW owed her a duty of care "not based on a special relationship, but because [RW], through his own actions, is responsible for enabling [HW] to engage in sexual misconduct with female actresses, and as a result placed [Plaintiff] in a position of foreseeable harm." *Id.* Plaintiff contends that the "nearly

---

[7] Plaintiff seems to have abandoned her previous theory of negligence—that RW had a duty to prevent HW from committing tortious acts by virtue of a "special relationship." The Court nonetheless notes that the additional allegations in the TAC do not support a finding of any "special relationship" sufficient to give rise to a duty. Moreover, Plaintiff's attempt to repackage her claim by arguing that she has sued RW in his "personal capacity," as HW's "brother and long-time business partner," as opposed to in his official capacity, as a director and officer of the Companies, *see* Pl. Opp'n, Dkt. 170, at 6, makes no difference. Plaintiff points to no authority that would support a claim of third-party negligence based on such a familial or long-time business relationship, and the Court is aware of none.

fifty additional allegations" about RW in the TAC "demonstrate that he did more than fail to act," *id.* at 9, i.e., that he engaged in certain "affirmative conduct that created or exacerbated a risk of danger to which she otherwise would not have been exposed," *id.* at 2. While it is true that Plaintiff added almost fifty allegations to the TAC, purportedly detailing RW's liability, *see* TAC ¶¶ 41–87, these allegations are insufficient to show that RW engaged in any affirmative act that could give rise to a duty of care.

Plaintiff asserts specifically that RW engaged in three categories of affirmative acts that "created" or "exacerbated" her risk of harm: (1) covering up of HW's sexual misconduct, including by paying and otherwise being involved in settlements, *see, e.g., id.* ¶¶ 43–49, 64, 102; (2) making public statements regarding HW, portraying him as a "kind" and "gentle" person, *see, e.g., id.* ¶¶ 57–59; and (3) providing HW with the resources and opportunities with which to engage in sexual misconduct, *see, e.g., id.* ¶¶ 62, 68, 78–79. *See also* Pl. Opp'n, Dkt. 170, at 1 ("For years, [RW] actively worked to conceal [HW's] sexual misconduct, to present a false impression to the world that [HW] was safe to work with, and he continued to empower [HW] with resources, status and opportunities to find more victims."). Notwithstanding these additional allegations, Plaintiff's negligence claim against RW still boils down to the same claim that she previously—and unsuccessfully—asserted against RW and the other Director Defendants: that RW failed to act to prevent harm caused by HW. Indeed, the entire premise of Plaintiff's negligence claim is that, despite RW's purported knowledge, acquiescence, and concealing of HW's sexual misconduct, RW failed to act. *See, e.g.,* TAC ¶ 2 (RW "covered for HW's sexual misconduct and created an environment where [Plaintiff] and scores of other female employees and actresses were harmed by a sexual predator, yet RW did nothing to warn these women about HW's propensity to engage in sexual misconduct, or prevent HW from using the Companies' resources to lure these women

to him."); *see, also, e.g., id.* ¶¶ 62, 64, 67–68, 71–73, 76.

The TAC simply does not plead any *active* role—i.e., affirmative misfeasance—on the part of RW sufficient to give rise to a duty of care. *See David*, 2019 WL 1864073, at *1–3, *6–7 (rejecting similar arguments that RW owed a duty of care based on his purported "facilitation" and "enabl[ing]" of HW's alleged misconduct, and stating that, while "such actions on the Director Defendants' part were not without moral culpability," Plaintiff "failed to allege how this constituted negligence as a legal matter"); *see also Melton v. Boustred*, 183 Cal. App. 4th 521, 531 (Ct. App. 2010) ("Misfeasance exists when the defendant is responsible for making the plaintiff's position worse, i.e., defendant has created a risk. Conversely, nonfeasance is found when the defendant has failed to aid plaintiff through beneficial intervention."). At most, the TAC alleges that RW concealed HW's acts of sexual misconduct, while making public statements that portrayed HW in a manner that belied his violent and predatory nature.[8] Even accepting the allegations as true, however, neither the alleged concealment nor the public statements give rise to a duty owed by RW to Plaintiff. *See In re Sept. 11 Litig.*, 280 F. Supp. 2d 279, 290 (S.D.N.Y. 2003) ("The injured party must show that a defendant owed not merely a general duty to society but a specific duty to the particular claimant, for 'without a duty running directly to the injured person there can be no liability in damages, however careless the conduct or foreseeable the harm.'") (quoting *Lauer v. City of New York*, 95 N.Y.2d 95, 100 (2000)); *see also Fernandez v. New England Motor Freight, Inc.*, No. 12-CV-6536 (VEC), 2015 WL 4002233, at *2 (S.D.N.Y. July 1, 2015) ("To establish the existence of a duty under New York law, '[t]he injured party must

---

[8] As to the third category of purported affirmative acts— that RW "continued to empower [HW] with resources, status and opportunities to find more victims"—the TAC is insufficient for the reasons addressed in the Court's prior opinion. *See David*, 2019 WL 1864073, at *6–7.

show that a defendant owed not merely a general duty to society but a specific duty to the particular claimant.'") (quoting *Perkins Eastman Architects, P.C. v. Thor Eng'rs, P.A.*, 769 F. Supp. 2d 322, 328 (S.D.N.Y. 2011)). The Court is not persuaded by the suggestion that RW's purported concealment of misconduct—seemingly unrelated to Plaintiff and primarily from the 1990s—created a risk to Plaintiff. Nor can be it said that RW's public statements, which Plaintiff does not allege to have read or relied on prior to meeting with HW, created a risk. Indeed, the TAC does not allege that RW ever met or interacted with Plaintiff, or that he even knew who she was. Even accepting all of its allegations as true, the TAC thus fails to plead that RW's conduct "created a peril" that would give rise to a duty of care owed to Plaintiff.

The Court also notes that the other judges in this district to expressly consider RW's liability—albeit under different causes of action—have consistently found the allegations insufficient to withstand motions to dismiss. *See, e.g.*, *Geiss*, 383 F. Supp. 3d at 166, 176 (dismissing claims based on allegations that RW was "aware of his brother's sexual misconduct, authorized Miramax and TWC to settle claims relating to that misconduct, and personally paid one victim and the colleague who reported the assault"); *Canosa*, 2019 WL 498865, at *3, *27 (dismissing claims based on allegations that RW "knew of his brother's sexual assaults of various women while he and his brother jointly held positions at Miramax and TWC, . . . and that he did not investigate or take corrective action," and further that RW "used settlements with other women, which contained strict non-disclosure agreements binding victims and witnesses, to prevent other TWC employees, the public, and law enforcement from learning of his brother's misconduct"); *Noble*, 335 F. Supp. 3d at 513, 526 (dismissing claims based on allegations that RW "knew about, and benefitted from, [HW's] international business dealings," knew about HW's "pattern and practice" of enticing "young female actors with the promise of roles," and "'willfully caused'

[HW's] sex acts with [plaintiff] by 'supporting [HW's] pursuit of their joint business interests'").

Moreover, contrary to Plaintiff's assertion, *Pamela L. v. Farmer*, 112 Cal. App. 3d 206 (Ct. App. 1980), does not support the conclusion that RW is liable; rather, it supports the conclusion that RW cannot be held liable for HW's misconduct absent any purported "affirmative acts." In *Pamela L*, a wife was found negligent based on her husband's sexual abuse of two children. There, however, the wife's liability stemmed not only from her knowledge that her husband was a sex offender, but also from her own affirmative acts of encouraging and inviting the children over to play, preparing refreshments to "entice" the children to her house, and telling the children's parents that it would be "perfectly safe" for them to come over while she was not home because her husband would be there. *Pamela L.*, 112 Cal. App. 3d at 210. The court thus found that there was "a fairly close connection" between the wife's "invitation" and the "ultimate harm" to the children. *Id.* at 211. No such "close connection" is alleged in the TAC.[9] Even if accepted as true, the allegations in the TAC fail to support a finding of any affirmative acts or misfeasance on the part of RW.

As the allegations also do not support a finding of any special relationship, the Court concludes that RW did not owe Plaintiff a duty of care. Without a duty running from RW to Plaintiff, her negligence claim must fail. *See In re Sept. 11 Litig.*, 280 F. Supp. 2d at 290 ("[W]ithout a duty running directly to the injured person there can be no liability in damages, however careless the conduct or foreseeable the harm.") (quoting *Lauer*, 95 N.Y.2d at 100); *see also McCarthy v. Olin Corp.*, 119 F.3d 148, 156 (2d Cir. 1997) ("[I]t may be said that the defendant was negligent, but is not liable because he was under no duty to the plaintiff not to be.") (citation

---

[9] *See also Melton*, 183 Cal. App. 4th at 533 ("[D]efendant's conduct in issuing that invitation [to a party at his home] did not create the peril that harmed plaintiffs.").

omitted); *Fernandez*, 2015 WL 4002233, at *2 ("In the absence of duty, there is no breach and without a breach there is no liability.") (quoting *Pulka v. Edelman*, 40 N.Y.2d 781, 782 (1976)); *Margaret W.*, 139 Cal. App. 4th at 150 ("If there is no duty, there can be no liability, no matter how easily one may have been able to prevent injury to another.") (citing *Delgado*, 36 Cal. 4th at 235).

Finally, because the Court has found that RW did not owe Plaintiff a duty of care—arising from either his affirmative conduct or any "special relationship"—the Court need not address the parties' arguments as to foreseeability. Foreseeability is relevant in determining the *scope* of the duty of care, only after a legally cognizable duty is established. *See McCarthy*, 119 F.3d at 156 ("In tort cases, foreseeability is often confused with duty. Foreseeability 'is applicable to determine the scope of duty—only after it has been determined that there is a duty.'") (quoting *Pulka*, 40 N.Y.2d at 785); *see also id.* ("The mere fact that a consequence might foreseeably result from an action or condition does not serve to establish a duty owing from a defendant to a plaintiff.") (quoting *Gonzalez v. Pius*, 525 N.Y.S.2d 868, 869 (App. Div. 1988)); *Regents*, 4 Cal. 5th at 630 ("Such case-specific foreseeability questions are relevant in determining the applicable standard of care or breach in a particular case. They do not, however, inform our threshold determination that a duty exists."); *Melton*, 183 Cal. App. 4th at 532 ("Where there is a legal basis for imposing a duty—as in cases of misfeasance or when a special relationship exists—the court considers the foreseeability of risk from the third party conduct.").[10]

---

[10] Although it is true that some California courts have suggested that the foreseeability inquiry may be properly considered as part of the Court's threshold determination of whether a duty exists, *see, e.g., Margaret W.*, 139 Cal. App. 4th at 150–51, 160–61, the Court is not persuaded that such an analysis is necessary here. At oral argument, Plaintiff's counsel explained that, while certain California cases have considered foreseeability at this stage, Plaintiff is "not necessarily relying on that analysis" because Plaintiff instead asserts that RW is "liable based on his own affirmative conduct." *See* Nov. 6, 2019 Tr., Dkt. 196, at 18.

Because Plaintiff has failed to adequately plead a legally cognizable duty, RW's motion to dismiss is granted.

## CONCLUSION

For the foregoing reasons, Defendant Harvey Weinstein's motion to dismiss is denied, and Defendant Robert Weinstein's motion to dismiss is granted. Plaintiff's claims for sexual battery, gender violence, battery, assault, sex trafficking, negligence, and negligent retention or supervision will proceed against Harvey Weinstein, The Weinstein Company LLC, and The Weinstein Company Holdings LLC.

The Clerk of Court is respectfully directed to terminate the motions pending at Dkts. 164 and 167.

SO ORDERED.

Dated:    December 19, 2019
          New York, New York

Ronnie Abrams
United States District Judge